Filed 7/9/14 Unmodified version attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARISSA REA et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>BLUE SHIELD OF CALIFORNIA,<br><br>    Defendant and Respondent. | B244314<br><br>(Los Angeles County<br>Super. Ct. No. BC468900)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 10, 2014, be modified as follows:

1. On page 21, the first line of first full paragraph, the words "Blue Cross" are deleted and replaced with the words "Blue Shield."

2. On page 23, line six of the second full paragraph, the word "DMHC" is deleted and replaced with the words "Department of Insurance."

There is no change in the judgment.

The petition for rehearing is denied.

_____

  ROTHSCHILD, Acting P .J.          JOHNSON, J.          MILLER, J.[1]

_____

    [1] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| MARISSA REA et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>BLUE SHIELD OF CALIFORNIA,<br><br>    Defendant and Respondent. | B244314<br><br>(Los Angeles County<br>Super. Ct. No. BC468900) |


    APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge. Reversed.

    Kantor & Kantor, Lisa S. Kantor, J. David Oswalt and Elizabeth K. Green for Plaintiffs and Appellants.

    Law Offices of Daniel H. Willick and Daniel H. Willick for Honorable Helen MacLeod Thomson and California Psychiatric Association as Amici Curiae on behalf of Plaintiffs and Appellants.

    Disability Rights California, Melinda Bird, Connie Huang Chu; Western Center on Law and Poverty, Richard A. Rothschild and Mona Tawatao for Mental Health America of California, Mental Health Advocacy Services, Inc., Alliance of California Autism Organizations, Autism Deserves Equal Coverage, Disability Rights Education and Defense Fund, Inc., Disability Rights Legal Center and National Health Law Programs as Amici Curiae on behalf of Plaintiffs and Appellants.

California Department of Insurance, Adam M. Cole and Teresa R. Campbell for California Insurance Commissioner Dave Jones as Amicus Curiae for Plaintiffs and Appellants.

Law Offices of Russell G. Petti and Russell G. Petti for International Association of Eating Disorders Professionals, Eating Disorder Coalition, Binge Eating Disorder Association and Residential Eating Disorder Coalition as Amici Curiae for Plaintiffs and Appellants.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Adam Pines and Joanna S. McCallum for Defendant and Respondent.

Crowell & Moring, William A. Helvestine and David D. Johnson for California Association of Health Plans as Amicus Curiae on behalf of Defendant and Respondent.

_____

In 1999, the Legislature enacted the California Mental Health Parity Act (Health & Saf. Code, § 1374.72)[2] (Parity Act) to address the imbalance between medical coverage for physical illnesses and mental illnesses. The Parity Act mandated that every health care service plan contract "provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses . . . under the same terms and conditions applied to other medical conditions." (§ 1374.72, subd. (a).) At issue in this appeal is whether the Parity Act requires coverage for residential treatment for the eating disorders anorexia nervosa and bulimia nervosa even where the health plan does not provide coverage. In *Harlick v. Blue Shield of California* (2012) 686 F.3d 699 (*Harlick*), the Ninth Circuit found that the Parity Act, which requires coverage for all "medically necessary treatment" for "several mental illnesses" mandated the coverage of residential care treatment for such eating disorders. The trial court here disagreed, holding that the statutory language of the Parity Act and the statutory scheme of the Knox-Keene Health Care Service Plan Act of 1975 (§§ 1340–1399) (Knox-Keene Act) (of which the Parity Act is a part), as

_____

[2] All further statutory references are to the Health and Safety Code unless otherwise indicated.

2

well as the Parity Act's legislative history, did not support coverage for a treatment not specifically enumerated in the Parity Act.

Plaintiffs Marissa Rea and Kelly Melachouris, who suffer from eating disorders and are covered by defendant Blue Shield of California's health plans, principally argue on appeal that the Parity Act's "medically necessary treatment" language must be read broadly to include residential treatment for the mental illnesses anorexia nervosa and bulimia because there is no treatment analog in the realm of treatments for physical illnesses, and thus the trial court's limited reading of the statute failed to take into account the Legislature's goal of achieving parity. Blue Shield counters that nothing in the statutory language evinces a legislative intent to cover all treatments for mental illness simply because they are medically necessary; rather, reference must be made to the Knox-Keene Act of which the Parity Act is a part and which defines required coverage for physical illnesses to consist of "basic health services."

We conclude that the Legislature in crafting the Parity Act, which uses broad statutory language to mandate the provision of medically necessary services for mental health conditions, recognized that most mental health conditions have a physical basis, and also recognized the fundamental difference between the most effective treatments of mental and physical conditions. As a result the Legislature chose to delimit the scope of the Parity Act's reach with the concept of "medically necessary" rather than relying on the Knox-Keene Act's limiting principle of "basic health services." We reverse the judgment of the trial court.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

### A. Legal Framework

#### 1. Knox-Keene Act and the Parity Act

In 1975, the Legislature enacted the Knox-Keene Act, which provides the legal framework for the regulation of California's individual and group health care plans, including health maintenance organizations (HMO) and other similarly structured managed care organizations (MCO). While HMO's and MCO's are regulated by the

Department of Managed Health Care (DMHC), traditional health insurance companies are regulated by the Department of Insurance.  The express purpose of the Knox-Keene Act is "to promote the delivery of health and medical care" for persons enrolled in health care service plans.  (§ 1342.)  The Knox-Keene Act provides that DMHC "has charge of the execution of the laws of this state relating to health care service plans and the health care service plan business including, but not limited to, those laws directing the department to ensure that health care service plans provide enrollees with access to quality health care services and protect and promote the interests of enrollees."  (§ 1341, subd. (a).)  Under the Knox-Keene Act, plans must provide their subscribers with "basic health care services," which are defined to include physician services, hospital inpatient services, diagnostic laboratory services, home health services, and preventive health services.  (§ 1345, subd. (b).)  DMHC's director is authorized to define the scope of required basic health care services.  (§ 1367, subd. (i).)

In 1999, in enacting the Parity Act, the California Legislature specifically found that mental illnesses can be reliably diagnosed and treated, and that the treatment of mental illness was cost effective.  Further, most private health insurance policies "provide coverage for mental illness at levels far below coverage for other physical illnesses." (Assem. Bill No. 88 (1999–2000 Reg. Sess.) ch. 534, § 1.)  Such coverage limitations resulted in inadequate treatment of mental illnesses, "relapse and untold suffering," as well as increases in homelessness, crime, and resultant demands on the state budget. (*Ibid.*)

The three main subdivisions of the Parity Act and its implementing regulation are the heart of the present debate over the scope of coverage for residential care to treat eating disorders.  The Parity Act provides that, beginning in July 2000, every health plan providing hospital, medical or surgical coverage must also "provide coverage for the diagnosis and *medically necessary treatment* of severe mental illnesses of a person of any age" as specified in the statute.  (§ 1374.72, subd. (a), italics added (hereafter subdivision (a)).)  The statute specifically itemizes the "'severe mental illnesses'" which

4

must be covered, including "[a]norexia nervosa" and "[b]ulimia." (§ 1374.72, subd. (d)(7), (8).)

The Parity Act does not specifically define the term "medically necessary treatment," although it does state that "[t]hese benefits include" outpatient services, inpatient hospital services, partial hospital services, and prescription drugs (if the plan otherwise covers prescription drugs.) (§ 1374.72, subd. (b) (hereafter subdivision (b).)[3] The Parity Act also provides "[t]he terms and conditions applied to the benefits required by this section, that shall be applied equally to all benefits under the plan contract, shall include, but not be limited to, the following: [¶] (1) [m]aximum lifetime benefits[;] [¶] (2) [c]opayments[; and] [¶] (3) [i]ndividual and family deductibles." (§ 1374.72, subd. (c) (hereafter subdivision (c).)

The Parity Act's implementing regulation states, "(a) The mental health services required for the diagnosis, and treatment of conditions set forth in [] section 1374.72 shall include, when medically necessary, all health care services required under the Act including, but not limited to, basic health care services within the meaning of Health and Safety Code sections 1345(b) and 1367(i), and section 1300.67 of Title 28." (Cal. Code Regs., tit. 28, § 1300.74.72, subd. (a) (implementing regulation).)[4]

## 2. *Harlick v. Blue Shield*

On June 4, 2012, in *Harlick, supra*, 686 F.3d 699, the Ninth Circuit interpreted these provisions and addressed the issue of whether residential treatment for anorexia nervosa was covered under Blue Shield's insurance plan, and if not, whether the Parity

---

[3] Section 14059.5 of the Welfare and Institutions Code, governing public social services, states "[a] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."

[4] Blue Shield is a health care service plan provider and governed by DMHC. (§ 1341, subd. (a).) Health insurance plans are covered by the Department of Insurance, and the version of the Parity Act applicable to such plans is found at Insurance Code section 10144.5. There is no regulation parallel to the implementing regulation that implements Insurance Code section 10144.5.

Act nonetheless required coverage.[5]  Blue Shield's plan covered inpatient services, limited outpatient services, office visits, psychological testing, and counseling sessions for the treatment of mental illnesses.  Although the *Harlick* court held the terms of Blue Shield's plan did not cover residential treatment for anorexia nervosa, the court found that the Parity Act mandated such a level of care.  (*Id.* at pp. 710, 721.)

*Harlick*, *supra*, 686 F.3d 699 reasoned that section 1374.72 defined anorexia nervosa as a "serious mental illness" that was subject to the Parity Act and therefore subdivision (a) required that "medically necessary treatment" be provided for the condition.  Further, *Harlick* concluded the four benefits listed in subdivision (b)— (1) outpatient services; (2) inpatient hospital services; (3) partial hospitalization services; and (4) prescription drugs, if the plan contract includes coverage for prescription drugs— were not exhaustive because the language of the implementing regulation stated that the medically necessary benefits required to be provided included, but was not limited to, the basic health care services set forth in subdivision (b).  (*Id*. at p. 712.)  In addition, the DMHC had asserted that it was not appropriate to list all services a plan needed to achieve parity because beyond specifying some of the essential services, "'it was sufficient to state that the plans must provide all medically necessary services.  To the extent that certain services are medically necessary, then those services will be provided.'"  (*Id.* at p. 715, italics omitted.)

---

[5] The Ninth Circuit originally issued its opinion on August 26, 2011.  Blue Shield petitioned for rehearing on the basis that the court's opinion concluded that there was no link between the scope of benefits required under the Parity Act and the rest of the Knox-Keene Act.  According to Blue Shield, in reaching this result, the court mistakenly interpreted the implementing regulation to refer to the Parity Act, not the Knox-Keene Act ("[t]he mental health services required for the diagnosis, and treatment of conditions set forth in Health and Safety Code section 1374.72 shall include, when medically necessary, all health care services required under *the Act* including, but not limited to, basic health care services . . . .").  However, elsewhere in the regulations, the "Act" is specifically defined as the Knox-Keene Act (Cal. Code Regs, tit. 28, § 1300.45, subd. (a).)

*Harlick*, *supra*, 686 F.3d 699 further reasoned that the Knox-Keene Act and the Parity Act operated in fundamentally different ways: Mandated coverage under the Parity Act applied to nine specified "severe mental illnesses," while Knox-Keene Act mandated coverage for all physical illnesses, whether severe or not; thus, the Parity Act limited insurer liability by limiting the illnesses to which it applied, while Knox-Keene Act limited insurer liability by limiting the scope of medically necessary treatments. (*Id.* at p. 716.) As a result, "[t]he most reasonable interpretation of the Parity Act and its implementing regulation is that plans within the scope of the Act must provide coverage of all 'medically necessary treatment' for 'severe mental illnesses' under the same financial terms as those applied to physical illnesses." (*Id.* at p. 719.)

The dissent in *Harlick*, *supra*, 686 F.3d 699 observed that the text of the Parity Act's implementing regulation that "'services required . . . shall include, when medically necessary, all health care services'" was modified by the language of the second portion of that sentence, "'required under the [Knox-Keene] Act.'" (*Id*. at p. 723 (conc. & dis. opn. of Smith, J.).) As a result, the dissent concluded the second portion of the implementing regulation's text limited the scope of the health care services that must be provided by the Parity Act to the types of benefits *already* provided under the Knox-Keene Act, and the Parity Act could thus not be used to enlarge the scope of the Knox-Keene Act. "It is undisputed that the Knox-Keene Act does not require all medically necessary treatment for physical illnesses. [Citation.] Thus, viewed in this light, the 'when medically necessary' language operates as a necessary (rather than sufficient) condition on the type of benefits that must be provided. In other words, plans must provide the type of benefits the Knox-Keene Act provides when they are medically necessary for mental health." (*Id.* at pp. 723–724.) The dissent found the majority ignored this modifying language and ran afoul of the statutory construction rule that no words should be treated as surplusage. (*Id.* at p. 724.) Further, the dissent found that the "including, but not limited to" language in the implementing regulation on which the majority relied did not contradict the dissent's interpretation of the Parity Act.

7

"California courts have explained that, while the phrase 'including, but not limited to' is admittedly a 'phrase of enlargement,' this phrase is 'not a grant of carte blanche that permits all actions without restriction,' and it cannot be used to create an 'unreasonable expansion of the legislature's words. . . .'  [Citations.]  Thus, the context surrounding the 'including, but not limited to' phrase cannot be ignored when determining the extent of the 'enlarging' effect this phrase has on benefits that [the implementing regulation] requires insurance companies to provide."  (*Ibid.*)

## B. Procedural History

### 1. Plaintiff's First Amended Complaint (FAC)

Plaintiffs were enrolled in Blue Shield health plans that cover the treatment of mental illness, but exclude coverage for residential treatment.[6]  Both plaintiffs suffer from eating disorders (either anorexia nervosa or bulimia nervosa), and have been advised by their treating medical professionals that residential treatment for their eating disorders was medically necessary and they meet the criteria for such treatment.

The FAC alleged that eating disorders have the highest mortality rate of any mental illness, and can lead to medical complications including cardiac arrhythmia, heart failure, kidney stones and kidney failure, cognitive impairment, osteoporosis, and infertility.  Suicide, depression, and anxiety are common in eating disorder sufferers.  One of the most effective therapies for treating eating disorders is residential treatment and is widely accepted in the medical community and recognized by the American Psychiatric Association as a critical level of care.  Residential treatment entails less intense medical monitoring than hospital-based care, and lasts several months.  Residential treatment is necessary where the individual does not make progress on an out-patient basis.

---

[6] The plans defined residential care as "services provided in a facility or freestanding residential treatment center that provides overnight/extended stay services for Members who do not qualify for acute care or skilled nursing care."  The treatment centers at which plaintiffs sought care provided, among other things, room and board, counseling, family education, nutritional education, yoga, meditation, menu planning, and recreational activities.

8

Treatment includes 24-hour monitoring, group therapy, individual therapy, dietary consultation and education, therapeutic meals, and pharmaceutical treatment.

Plaintiffs sought class certification on behalf of themselves and others similarly situated who had been denied residential treatment under their health insurance policies or health care service plans for eating disorders in violation of the Parity Act. Plaintiffs' FAC stated claims for breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, unfair business practices under Business and Professions Code section 17200 et seq., and violation of the Unruh Civil Rights Act (Civ. Code, § 51).

### 2. *Blue Shield's Demurrer*

Blue Shield demurred to the FAC, principally arguing that plaintiffs' interpretation of the Parity Act requiring residential treatment for eating disorders because such treatment was "medically necessary" would entail the provision of services not otherwise mandated under the Knox-Keene Act as basic health care services; as a result, plaintiffs' interpretation required health plans to provide broader coverage for mental illness than for physical illness. Instead, subdivision (b)'s four types of care—which did not include residential care—were the minimum required under the Parity Act; for that reason, not all medically necessary care was required for severe mental illness, but only that medically necessary care as set forth in subdivision (b). As a result, plaintiffs mistakenly interpreted the implementing regulation's reference to "all health care services required under the Act" as referring to the Parity Act, not the Knox-Keene Act. In support of its demurrer, Blue Shield requested judicial notice of the legislative history of the Parity Act.

Plaintiffs' opposition asserted the *Harlick*, *supra*, 686 F.3d 699 court correctly found the Parity Act's mandated equality of coverage between physical and mental illnesses required that Blue Shield cover all medically necessary treatment of the enumerated mental illnesses because mental illnesses could not be treated the same way as physical illnesses. Plaintiffs pointed out that the concept of "medically necessary" (or "medical necessity") was the lynchpin of the Knox-Keene Act and this commonly understood term meant that the Parity Act required the full breadth of coverage to mental

9

health patients.  Moreover, the legislative history demonstrated the Parity Act was intended to eliminate the disparity between coverage for mental and physical illnesses. Plaintiffs requested judicial notice of, among other things, the regulatory history of the implementing regulation.

In reply, Blue Shield reasserted that the Legislature intended to achieve parity in coverage, not to mandate all medically necessary care for mental illness.  In that regard, it argued that the Parity Act did not require coverage for *all* medically necessary services, and did not limit the application of the "terms and conditions" to mental illnesses to those that are financial in nature; to find otherwise would unduly expand the scope of coverage.

### 3. *Trial Court Ruling*

The trial court sustained Blue Shield's demurrer without leave to amend.  The trial court found that the Parity Act was part of the Knox-Keene Act; the Knox-Keene Act defined "basic health care services" in section 1345, subdivision (b) to include seven enumerated items.  The trial court declined to follow *Harlick*, *supra*, 686 F.3d 699 for several reasons.  First, in *Harlick*, both parties agreed "that the phrase 'terms and conditions' refers to monetary conditions, such as copayments and deductibles," while here, the parties did not agree on this definition.  The trial court observed, "[w]ithout question, the three enumerated 'terms and conditions' in subsection (c) involve financial subjects, but the use of 'including but not limited to' implies that the [L]egislature did not intend to so limit the conditions."  Thus, the Legislature intended to refer to more than the three enumerated terms and conditions, and that they need not be limited to financial points.

As a result, as Blue Shield pointed out, if "terms and conditions" included only the financial limitations listed in subdivision (c), then "'the plan is not allowed to enforce the numerous substantive (i.e. nonfinancial) terms and conditions that are generally applicable to all benefits.'"  Thus, for example, the plan would be required to cover the following for mental health conditions, even when not covered for physical conditions: services performed in a hospital by interns or others in training, services performed by a

10

close relative who lives with the plan member, drugs not approved by the FDA, services for vocational and other forms of therapy, services by an unlicensed individual, services covered by workers' compensation, etc. The trial court concluded such expanded coverage was not the result intended by a statute designed to achieve parity.

Second, the trial court found the phrase "include" in subdivision (b) was not intended to mean "including but not limited to." "It is nearly impossible to conclude that whoever drafted this statute meant for the former to include the latter when, in the same statute, the drafters used both terms." The trial court observed that a recognized rule of statutory construction posited that in such case, the use of a different term or provision in another part of the same statute means that the Legislature intended to convey a different meaning. Assuming the two phrases were not synonymous, the plain meaning rule meant that "include" encompassed less than "including but not limited to" and as a result, given that the list of mental illnesses in subdivision (c) was exhaustive, the Legislature could not have intended to mean subdivision (b) was a nonexhaustive list.[7]

Third, *Harlick*, *supra*, 686 F.3d 699 had assumed that the implementing regulation referred to the Knox-Keene Act, and not the Parity Act, yet *Harlick*'s interpretation assumed that the Knox-Keene Act did not constrain the Parity Act although the implementing regulation stated that the Parity Act should be determined by reference to the Knox-Keene Act—which in turn did not require coverage for all medically necessarily

---

[7] The trial court noted that two unpublished federal district court decisions agreed with this conclusion: *Wayne W. v. Blue Cross of California* (C.D.Utah, Nov. 1, 2007 No. 1:07-CV-00035-PGC, nonpub. opn.) and *Daniel F. v. Blue Shield of California* (N.D.Cal., Mar. 3, 2011 No. C 09–2037 PH, nonpub. opn.). Recently, an enrollee in a federal employee health insurance plan administered in California by Blue Shield sought and was denied coverage for residential treatment for an eating disorder and asserted that the plan violated the Parity Act. The United States District Court for the Northern District of California held that her claims were barred by sovereign immunity and the Parity Act was expressly preempted by the Federal Employees Health Benefits Act (5 U.S.C. § 8901 et seq.) (FEHBA). (*Brazil v. Office of Personnel Management* (N.D.Cal. Mar. 28, 2014 No. 12-CV-02898-WAO) [2014 WL 1309935] (*Brazil*).) *Brazil* has no application here because the Blue Shield plan at issue is not governed by FEHBA.

11

treatment. The trial court noted that *Harlick* ignored the fact that "including but not limited to" was necessarily circumscribed by the language "all health care services required under the Knox-Keene Act." Thus, the "including but not limited to" language could not expand beyond the universe of the Knox-Keene Act.

Fourth, *Harlick*, *supra*, 686 F.3d 699 observed that subdivision (b)(4) of the Parity Act states that plans must cover "[p]rescription drugs, if the plan contract includes coverage for prescription drugs." The Parity Act thus specifies that a plan need not cover prescription drugs for severe mental illnesses, even if they are medically necessary, unless the plan covers such drugs for physical illnesses. As a result, the Parity Act's specific carve-out from the coverage mandate for medically necessary prescription drugs indicates that all other benefits for severe mental illnesses must be provided whenever they are medically necessary, whether or not such benefits are covered for physical illnesses. The trial court found, "This portion of *Harlick* raises a valid point—one of the few which weigh in favor of Plaintiffs' position. It would be a strange move, indeed, for the [L]egislature to specifically indicate that all medically necessary prescription drugs need not be covered if it did not intend the [Parity Act] to cover all medically necessary treatment, generally. However, this singular point in favor of Plaintiffs is more than outweighed by the considerations noted above and continued below."

Fifth, the trial court turned to DHMC's interpretation of the Parity Act that in crafting the statute, it was not appropriate to list all services required and that it was sufficient to specify that "medically necessary" services be provided and concluded that DHMC's position was necessarily qualified by the limitation that such services be provided in parity with physical conditions. During the comment period on the regulation, DHMC rejected Blue Shield's request that the statute be rephrased to state that not all medically necessary treatment was covered and DMHC's response that it need not enumerate specific rehabilitative services because all medically necessary treatment was covered does not undermine the requirement that parity be maintained. However, DMHC rejected this provision, not because it disagreed with Blue Shield, but because DMHC

12

viewed the regulation as already clearly stating what Blue Shield was requesting. "Given that the statute requires parity in coverage, . . . the regulation requires only that health plans provide mental health coverage in parity with what the plan provides for other medical conditions. The draft regulation language makes clear that plans cannot limit mental health coverage to anything less than what is medically necessary and on parity with other health care provided by the plan."

The trial court turned to the statutory scheme and noted that in several instances, the Knox-Keene Act had specific requirements: For example, plans that offer hospital, medical, or surgical expenses on a group basis must offer certain equipment for the management and treatment of diabetes (§ 1367.51) and osteoporosis (§ 1367.67), AIDS vaccines (§ 1367.45) and benefits for comprehensive preventive care of children (§ 1367.3); plans covering prescription drugs must cover inhaler spacers for the management and treatment of pediatric asthma (§ 1367.06). The court noted that in "plac[ing] these focused mandates next to the fuzzy, confusing language of the [Parity Act], . . . it becomes difficult to conclude that the [Parity Act] is a comprehensive mandate for mental health treatment modalities ranging beyond what a policy provides for physical conditions. . . . This is not what our [L]egislature intended. If they did, one wonders why, in October 2011, they enacted [section] 1374.73. That statute requires health plans to provide coverage for behavioral treatment for autism. Yet autism is listed in the [Parity Act] [section] 1374.72[, subdivision] (d)(7), which means, if Plaintiffs are right, plans would already have to include behavioral treatment."

## DISCUSSION

### I. Standard of Review

#### A. *Demurrer*

On appeal from a judgment of dismissal following an order sustaining a demurrer, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose." (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) We assume

13

the truth of the properly pleaded factual allegations, facts that can be reasonably inferred from those pleaded, and facts of which judicial notice can be taken.  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)  We review the trial court's denial of leave to amend for an abuse of discretion.  (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497.)  "When a demurrer is sustained without leave to amend, we determine whether there is a reasonable probability that the defect can be cured by amendment. [Citation.]"  (*V.C. v. Los Angeles Unified School Dist.* (2006) 139 Cal.App.4th 499, 506.)

### B.	Judicial Notice

As a demurrer challenges defects on the face of the complaint, it can only refer to matters outside the pleading that are subject to judicial notice.  (*County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1008–1009.)  We must take judicial notice of matters properly noticed by the trial court, and may take notice of any matter specified in Evidence Code section 452.  (Evid. Code, § 459, subd. (a).)  While we may take judicial notice of court records and official acts of state agencies (Evid. Code, § 452, subds. (c), (d)), the truth of matters asserted in such documents is not subject to judicial notice. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564–1565.)  We reiterate that as this is an appeal from a ruling on a demurrer, our review must be based on the properly pleaded factual allegations in the complaint and the facts that may be properly judicially noticed.

The trial court took judicial notice of the legislative history of two bills related to the Parity Act:  Assembly Bill No. 88 and Senate Bill No. 468.  (Evid. Code, § 452, subd. (c).)  Assembly Bill No. 88 was approved by the Legislature in 1999 and enacted into law as section 1374.72.  (Assem. Bill No. 88 (1999–2000 Reg. Sess.) § 2.)  On the other hand, Senate Bill No. 468 was a competing bill considered by the Legislature, but not approved.  (Sen. Bill No. 468 (1999–2000 Reg. Sess.) § 1.)

On appeal, plaintiffs request that we take judicial notice of (1) Senate Bill No. 468 as amended by the Assembly and Senate; (2) the Senate Health and Human Services Committee Analysis on Senate Bill No. 468; (3) documents filed with the court in *Harlick*; (4) records of the superior court in *Consumer Watchdog v. Department of*

14

*Managed Health Care* (Super. Ct. L.A. County, 2009, No. BS121397); (5) the legislative history of section 1374.73; (6) Assembly Committee on Health Report on Senate Bill No. 946 dated September 7, 2011, and (7) DMHC's supplemental brief filed in *Consumer Watchdog v. California Department of Managed Health Care* (2014) 225 Cal.App.4th 862 (*Consumer Watchdog*). We take judicial notice of these documents. (Evid. Code, §§ 452, 459.)

## C.    Basic Principles of Statutory Interpretation

A reviewing court's fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977.) This task begins by scrutinizing the actual words of the statute, giving them their usual, ordinary meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476.) When the statutory language, standing alone, is clear and unambiguous—that is, has only one reasonable construction—courts usually adopt the plain or literal meaning of that language. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775.) The "plain meaning" rule, however, does not require courts to automatically adopt the literal meaning of a statutory provision. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

When statutory language is "susceptible to more than one reasonable interpretation," it is regarded as ambiguous and there is no plain meaning. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.) When statutory language permits more than one reasonable interpretation, "'we "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences."'" (*Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1073.)

We determine the apparent intent of the Legislature by reading the ambiguous language in light of the statutory scheme rather than reading it in isolation. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) The ambiguous language must be construed in

context, and provisions relating to the same subject matter must be harmonized to the extent possible. (*Ibid*.) In addition, we may determine the apparent intent of the Legislature by evaluating "'a variety of extrinsic aids, including the ostensible objects to be achieved'" by the statute, "'the evils to be remedied,'" the statute's legislative history, and public policy. (*Honchariw v. County of Stanislaus*, *supra*, 200 Cal.App.4th at p. 1073.)

Where the Legislature makes express statutory distinctions, we must presume it did so deliberately, giving effect to the distinctions, unless the whole scheme reveals the distinction is unintended. This concept merely restates another statutory construction canon: We presume the Legislature intended everything in a statutory scheme, and we should not read statutes to omit expressed language. As our Supreme Court stated, "we are aware of no authority that supports the notion of legislation by accident." (*In re Christian S*. (1994) 7 Cal.4th 768, 776.)

## II.     The Parity Act Requires Blue Shield to Provide Residential Treatment for Treatment of Plaintiffs' Eating Disorders Even Where Such Treatment Is Not Set Forth in the Plan

Plaintiffs principally argue that *Harlick* properly interpreted the Parity Act to require residential treatment for eating disorders where medically necessary because some treatments that are medically necessary for mental health conditions find no analog in the treatment of physical illness, and thus resort to the Knox-Keene Act's "basic health services" to define appropriate treatment for mental illnesses undermines the fundamental purpose of the Parity Act.

Blue Shield argues that the statutory language of the Parity Act, as well as the statutory scheme of which it is a part—the Knox-Keene Act—demonstrate that the Legislature intended to limit the concept of parity to the "basic health services" set forth in the Knox-Keene Act, and to find otherwise would unnecessarily expand the scope of treatment for mental illnesses with the end result that such illnesses receive far more coverage than physical illnesses. Blue Shield contends that nothing in the legislative history or DMHC's conduct indicate any other intent; further, as a policy matter, finding

16

coverage for residential treatment for eating disorders would have a substantial impact on the California health care market.

We begin our discussion by observing that the stated intent of the Parity Act is simple: to address the imbalance in coverage between mental illnesses and physical illnesses. To that end, the Parity Act states its legislative findings, in part, as follows: "Mental illness is treatable"; "[t]reatment of mental illness is cost-effective"; "there is increasing scientific evidence that severe mental illnesses, such as schizophrenia, bipolar disorders, and major depression, are as effectively treated with medications as other severe illnesses"; "[m]ost private health insurance policies provide coverage for mental illness at levels far below coverage for other physical illnesses"; "limitations in coverage for mental illness in private insurance policies have resulted in inadequate treatment for persons with these illnesses"; "[i]nadequate treatment causes relapse and untold suffering for individuals with mental illness and their families"; "[l]ack of adequate treatment and services for persons with mental illness has contributed significantly to homelessness, involvement with the criminal justice system, and other significant social problems experienced by individuals with mental illness and their families"; and the "failure to provide adequate coverage for mental illnesses in private health insurance policies has resulted in significant increased expenditures for state and local governments"; and "[t]he Legislature further finds and declares that other states that have adopted mental illness parity legislation have experienced minimal additional costs if medically necessary services were well managed." (Stats. 1999, ch. 534, § 1, p. 1.)

The Parity Act is not easy to decipher because it does not specify how to achieve parity other than in the sparse language of subdivisions (a), (b), and (c). Parity is an inherently elusive concept here because treatments for mental and physical illnesses can vastly differ in their modality and scope. Indeed, the lack of parity arose because of the differences in mental and physical illnesses. Once this difference is recognized—a difference that cannot be ignored—we find that it is the guiding principle that must inform our analysis of the statute at issue. Thus, how to achieve parity cannot depend

upon a rigid focus upon achieving identity of treatments for both types of illness. Rather, as the Legislature has demonstrated, parity was set forth with less precision in order that the distinctions between mental and physical illnesses would not interfere with the goal of achieving parity. It is for that reason—the need for flexibility in fashioning care for mental illnesses—we believe the Legislature declined to refer to "residential treatment" as a mandated treatment option for two of the specified severe mental illnesses, namely, anorexia nervosa and bulimia, and also declined to expressly exclude one of the most effective treatments for eating disorders. However, in attempting to permit some flexibility on the road to parity, the Legislature unfortunately created ample room for debate.

### A.     Statutory Language

Plaintiffs argue that interpreting subdivision (b) to be an exclusive list of the required treatments is contrary to the implementing regulation because that regulation states the mental health services required under the Parity Act "shall include, when medically necessary, all health care services required under the Act including, but not limited to, basic health care services," which makes clear that the Parity Act requires plans to provide all of the health care services required by the Knox-Keene Act, not just "basic health care services." Blue Shield asserts that the Parity Act can be interpreted as mandating parity only for the benefits listed in subdivision (b) because the phrase "shall include" in that subdivision, contrasted with the phrase "shall include, but not be limited to" in subdivision (c) meant the Legislature intended subdivision (b) to be an exhaustive list—particularly in light of the introductory phrases of subdivision (d) of the Parity Act, which uses "include" to mean an exhaustive list of the covered mental illnesses. Thus, while "include" in some cases can mean a nonexhaustive list, such interpretation is not reasonable in this statute, which uses both terms in sequential provisions.

We disagree that the list in subdivision (b) is exhaustive. Subdivision (b) provides that the services for mental illness mandated in subdivision (a) ("medically necessary treatment") "shall include the following" four categories of benefits: outpatient services,

18

inpatient hospital services, partial hospitalization services, and prescription drugs (if the plan otherwise includes prescription drugs). As a basic principle of statutory construction, "include" is generally used as a word of enlargement and not of limitation. (*People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639.) Thus, where the word "include" is used to refer to specified items, it may be expanded to cover other items. (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1100–1101.) Thus, a simple reading of subdivision (b) indicates that the mandated services for mental illnesses are not limited to the four enumerated items.

The implementing regulation is more specific and provides that the *mental health services* required for the diagnosis and treatment of the specified severe mental illnesses "shall include, when medically necessary, all health care services under the Act, including but not limited to, basic health care services within the meaning of Health and Safety Code section 1345[, subdivision] (b)." (Cal. Code Regs., tit. 28, § 1300.74.72, subd. (a).) Both "includes" and "including" are words of enlargement. (*In re Marriage of Angoco & San Nicolas* (1994) 27 Cal.App.4th 1527, 1534.) Thus, as both subdivision (b) and the implementing regulation use words of enlargement, it does not follow, as Blue Shield argues or as the trial court concluded, that the use of the two different phrases means that subdivision (b) should be read as an exhaustive list because the use of a *different* term or provision in another part of the same statute means that the Legislature intended to convey a different meaning. (See, e.g., *Romano v. Mercury Ins. Co.* (2005) 128 Cal.App.4th 1333, 1344.) Rather, here both phrases mean the same thing and thus for purposes of statutory construction are identical. In such case, they are to be given the same meaning absent legislative intent to the contrary. (*Delaney v. Baker* (1999) 20 Cal.4th 23, 41–42.)

Thus, we do not agree that a simpler enlargement phrase ("includes") becomes a limiting phrase merely because in a related statute another enlarging phrase ("including but not limited to") is used. More likely, the Legislature chose to use two different phrases to indicate enlargement. This analysis applies equally to subdivision (c), which

provides that the "terms and conditions applied to the benefits required by this section" "shall include, but not be limited to" the three financially-based conditions.

### B. Subdivision (c) "Terms and Conditions"

Blue Shield contends that the three conditions of subdivision (c)—which are financial in nature—are not limited to financial conditions because otherwise an insurer or plan would not be able to enforce the numerous nonfinancial terms and conditions generally applicable to all health benefits under a plan contract. The phrase "terms and conditions" is used throughout the Insurance Code to apply to subjects not limited to financial issues. Plaintiffs contend Blue Shield is estopped from making this argument because it took the contrary position in *Harlick*; under the doctrine of *ejusdem generis* the "terms and conditions" of subdivision (c) are limited; and the issue is not ripe for consideration because it was not raised in this lawsuit.

A party may raise a new issue on appeal if the issue is purely a question of law. (*Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1141.) As questions of statutory interpretation are issues of law, the scope of subdivision (c)'s "terms and conditions" is properly before us. Further, the doctrine of judicial estoppel applies where "'(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.'" (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986–987.) The court in *Harlick*, *supra*, 686 F.3d 699 observed that "the parties agree that 'terms and conditions' refers only to financial terms and conditions." (*Id*. at p. 712.) We cannot conclude from this, however, that *Harlick* accepted this as Blue Shield's position, and thus decline to apply judicial estoppel.

However, we agree with plaintiffs that the issue is not ripe for consideration because the issue before us—notwithstanding Blue Shield's attempt to insert the issue into these proceedings—is not whether the limitations of subdivision (c) apply to prohibit

20

residential treatment for mental health conditions under the Parity Act. Thus, the question of whether nonmonetary limitations apply to residential treatment is an abstract proposition not before this court at this time. "'The ripeness requirement prevents courts from issuing purely advisory opinions,'" and "'is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion.'" (*Consumer Cause Inc. v. Johnson & Johnson* (2005) 132 Cal.App.4th 1175, 1183.)

### C. *Statutory Scheme—Knox-Keene Act Limitations*

Blue Cross points to the Parity Act's position within the Knox-Keene Act and contends that as a result, the concept of parity begins with the Knox-Keene Act's general coverage requirements, which do not mandate coverage for all care deemed medically necessary, but instead only require "[b]asic health care services" as defined in section 1345, subdivision (b). Plaintiffs' interpretation that the Parity Act requires coverage for *all* medically necessary treatment of severe mental illnesses when such coverage is not mandated for physical illnesses renders part of the statute surplusage and contradictory because if the Legislature had intended coverage for *all* such treatment, it would have inserted the word "all" into the statute. Further, interpreting the Parity Act to require coverage for all medically necessary treatment is inconsistent with the DMHC's enabling regulation because the enabling regulation ties coverage to the Knox-Keene Act (coverage "shall include, when medically necessary, all health care services required under the [Knox-Keene] Act including, but not limited to, basic health care services").[8] We disagree.

---

[8] The debate over whether the Knox-Keene Act limits the Parity Act arises from the rehearing in the *Harlick*, *supra*, 686 F.3d 699 case (see fn. 5, *ante*). As *Harlick* noted, the regulation implementing the Parity Act does not specify whether the act to which it refers without specification is the Knox-Keene Act or the Parity Act, but that Administrative Code section 1300.45 provides definitions for terms used in health care regulations. Section 1300.45, subd. (a), promulgated in 1976, defines "Act" to mean "the Knox-Keene Health Care Service Plan Act of 1975." (*Harlick*, at p. 714; see also *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 492 [inserting "Knox-Keene" in brackets when quoting Cal. Code Regs., tit. 28, § 1300.74.72, subd. (a)].)

21

Statutes are to be read in context, with the nature and obvious purpose of the statute in mind.  (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 679.)  "[W]e do not construe statutes in isolation, but read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]"  (*People v. Pieters* (1991) 52 Cal.3d 894, 899.)  Furthermore, in looking at the relationship between two statutes, "each sentence must be read not in isolation but in the light of the statutory scheme."  (*Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735.)

Here, the implementing regulation states, "the mental health services required for the diagnosis and treatment of conditions set forth in . . . section 1374.72 shall include, when medically necessary, all health care services required under the Act including, but not limited to, basic health care services within the meaning of . . . section 1345[, subd.] (b)."  This straightforward language nowhere implies that it is limited to the Knox-Keene Act's "basic health care services."  Rather, the implementing regulation states that the mental health services required by the Parity Act "*include[], but [are] not limited to*, basic health care services within the meaning of . . . section 1345[, subd.] (b)."  (Italics added.)  Thus, we reject Blue Shield's distorted interpretation which concludes that because parity begins with the Knox-Keene Act's general provisions ("basic health care services"), parity can only require the section 1345, subdivision (b) services already provided for physical conditions because the Parity Act is part of the Knox-Keene Act. Such an interpretation flies in the face of the implementing regulation's language and the subdivision (a) manifesto that coverage is required for all "medically necessary treatment" of mental health conditions.

Indeed, as *Harlick*, *supra*, 686 F.3d 699 recognized, the coverage in the Parity Act *includes*, but is *not* limited to the "basic health services" of the Knox-Keene Act because the Parity Act is already limited by the "medically necessary" proviso.  (*Id*. at p. 716.) Further, as amicus curiae Helen MacLeod Thomson, the sponsor of Assembly Bill No. 88, and the California Psychiatric Association point out, MediCal, the program providing medical and mental health care for the poor, provides "adult residential

22

treatment" as a managed health care benefit to treat eating disorders. (Cal. Code Regs., tit. 9, §§ 1810.203, 1830.205.)

In that regard, Blue Shield argues that the Parity Act does not require coverage for *all* medically necessary treatment of mental illnesses because the Legislature did not use the word *all* in subdivision (a). Blue Shield points to the fact that subdivision (b) contains a limit on prescription drugs, which may be medically necessary to treat some mental illnesses. Rather than negating our conclusion, Blue Shield's argument actually raises the issue of whether a plan could lawfully limit prescription drugs for treatment of mental illness where such drugs were medically necessary.

In conclusion, the only proper limitation in terms of parity that can be placed on what is "medically necessary" to treat a severe mental illness, including bulimia or anorexia nervosa, are the particular limits of a given policy. (See § 1374.72, subd. (c).) Nonetheless, Blue Shield relies on the mandate of section 1374.73, which the Legislature added to the Parity Act to mandate coverage for behavioral health treatment for autism[9] (Stats. 2011, ch. 650, § 1), and the 2013 promulgation by the DMHC of a regulation pertaining to behavioral health treatment for pervasive developmental disorder or autism, to argue that requiring coverage for eating disorders under section 1374.72 will result in limitless coverage requirements. (See Cal. Code Regs., tit. 10, § 2562.4.) That regulation provides at subdivision (b), "In cases where behavioral health treatment is medically necessary, an insurer shall not deny or unreasonably delay coverage for behavioral health treatment: [¶] . . . [¶] (5) On the grounds that an annual visit limit has been reached or exceeded . . . ." (Cal. Code Regs., tit. 10, § 2562.4, subd. (b)(5).) Blue Shield argues that this regulation, which although by its terms applies solely to health insurance policies, not the health service plans at issue here and is a specific treatment for autism, demonstrates

---

[9] Section 1374.73 provides in pertinent part, "(a)(1) Every health care service plan contract that provides hospital, medical, or surgical coverage shall also provide coverage for behavioral health treatment for pervasive developmental disorder or autism no later than July 1, 2012. The coverage shall be provided in the same manner and shall be subject to the same requirements as provided in Section 1374.72."

23

that there is a slippery slope onto which health plans will slide with respect to residential treatment and where the promise of parity can easily turn into the creation of unlimited services. We disagree that such a slippery slope will exist with residential treatment for eating disorders under section 1374.72 because that statute contains no express provision creating such a gateway to unlimited coverage; further, as our interpretation finds, "medically necessary" coverage is coverage that is nonetheless limited by the policy limits.

Further, to the extent that Blue Shield, in order to bolster this position, relies on *Consumer Watchdog*, *supra*, 225 Cal.App.4th 862, where the court addressed the issue of whether health maintenance organizations were obligated to provide Applied Behavioral Analysis (ABA) therapy for autism by Behavior Analysis Certification Board (BACB) certified therapists, although such therapists were not licensed by the state as required by the Knox-Keene Act, such reliance is inapposite. On April 23, 2014, the Court of Appeal issued its opinion after rehearing, and held that section 1374.73, enacted October 9, 2011, required plans, as of July 1, 2012, to provide ABA therapy for autism disorders and that such therapy could be provided either by licensed therapists or BACB-certified therapists; as a result, plans could not deny ABA services where the basis for the denial was that a BACB-certified provider was not licensed. (See § 1374.73, subds. (c)(1)(B).) (*Consumer Watchdog*, at pp. 881–882.) *Consumer Watchdog*'s analysis of the Parity Act's autism provision has no application to our analysis of residential treatment for eating disorders because the Legislature's very specific mandates for autism were designed to address the provision of highly effective and unusual therapeutic services unique to autism.

### D. *Legislative History*

Plaintiffs argued that if the Legislature intended to exclude residential treatment from the Parity Act, it could have expressly said so. They rely on a competing bill, Senate Bill No. 468, that was not passed and which would have not only required "comprehensive mental health parity" for all mental illnesses, not just severe mental illnesses, but contained in its initial version a provision that plans could exclude treatment at a residential treatment facility

24

that was deleted by the Legislature in a subsequent version. Blue Shield counters that the fact the Legislature failed to specifically exclude residential services from parity coverage as plaintiffs argue does not mean such services are covered; rather, the Legislature in crafting the Parity Act was not focused on excluding specific services but in rectifying an imbalance in coverage and the absence of such a carve-out (which was considered and dropped from the parallel proposed legislation) does not create coverage.

**(1)     Background**

The legislative history of Assembly Bill No. 88 is unremarkable in terms of substantive revisions to the bill during its genesis. The bill was introduced on December 10, 1998, as part of the 1999–2000 regular session. (Assem. Bill No. 88 (1999–2000 Reg. Sess.) as introduced Dec. 10, 1998.) The bill was amended February 24, 1999, with very minor changes, including the deletion of borderline personality disorder as a "severe mental illness." (Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Feb. 24, 1999.) An amendment in the Senate dated August 17, 1999, made more minor revisions, including removing a provision to permit coverage through separate specialized health care service plans. (Sen. Amend. to Assem. Bill No. 88 (1999–2000 Reg. Sess.) Aug. 17, 1999.) Another Senate amendment dated September 8, 1999, changed the date of effectiveness from January 1, 2000 to July 1, 2000. (Sen. Amend. to Assem. Bill No. 88 (1999–2000 Reg. Sess.) Sept. 8, 1999.) Assembly Bill No. 88 passed on September 28, 1999.

The background history of the bill contains no references to the specific types of treatment for severe mental illnesses. Rather, it indicates the purpose of the bill was to "prohibit discrimination against people with biologically based mental illnesses, dispel artificial and scientifically unsound distinctions between mental and physical illnesses, and require equitable mental health coverage among all health plans and insurers to prevent adverse risk selection by health plans and insurers. . . . [M]ental illness is treatable in a cost-effective manner and . . . the failure of the health care system to provide adequate treatment for persons with mental illness has been costly not only to

25

mentally ill individuals and their families, but to society as a whole and particularly to state and local governments." (Sen. Com. on Insurance, Rep. on Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Feb. 24, 1999, p. 2.) The report further noted that at least 19 other states had laws requiring equitable coverage for mental illnesses, with benefits ranging from coverage of "all mental illnesses, plus chemical dependency, to only a selected number of severe or biologically based illnesses." The Parity Act would require "equitable coverage for selected severe mental illnesses." (*Id*. at p. 4.)

Representative of the history of Assembly Bill No. 88 is a report from the Assembly Committee on Appropriations, which stated that the bill's coverage requirements would increase the cost of health insurance premiums to employers and individuals, but the National Advisory Health Council believed the coverage would result in premium increases of less than 1 percent. However, a 1996 study by the Congressional Budget Office (CBO) projected premium increases between 3 and 4 percent. In turn, the CBO's study was questioned by RAND Corporation, which stated that the CBO estimates did not take into account the differences between managed care and fee-for-services based insurance. (Assem. Com. on Appropriations, Rep. on Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Mar. 24, 1999, p. 2.) Arguments in support of the bill included improvement to worker productivity, reduction of homelessness, and lowering of criminal justice system costs. The California Psychiatric Association (CPA) noted that the discrimination in health care between mental and physical ailments was based on the outdated belief that mental illnesses had no biological basis, but that an abundance of research established a difference in the brains of healthy individuals versus persons with severe mental illnesses. The CPA believed the bill should not be limited only to severe forms of mental illness. (*Id.* at p. 3.) The California Association of Health Plans (CAHP) opposed the bill unless amended, based on increased cost for small employers and individuals. (*Ibid*.) The CAHP also argued that costs of coverage would increase by up to 6.5 percent, and that "employers already had access to mental health coverage, since most health plans offered this coverage to employers who wanted to purchase it."

26

(Assem. Com. on Health, Analysis of Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Feb. 24, 1999, p. 5.)

An Assembly Bill Analysis stated Assembly Bill No. 88 should follow the federal Mental Health Parity Act by allowing employers to opt out of the mandate if it would increase premiums by more than 1 percent, and exclude individuals and small employers. (Assem. Rep. Bill Analysis, Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Feb. 24, 1999, p. 2.) The analysis recognized that 65 percent of business supported a mental health mandate if it raised premiums by 5 percent or less. (*Ibid.*) In a report of the Senate Committee on Insurance, the CPA pointed out that with managed care, controls would be in place to assure that the services required would be limited to those that are medically necessary. Further, the CPA supported Senate Bill No. 468. (Sen. Com. on Insurance, Analysis of Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Feb. 24, 1999, p. 4.) However, a Senate Rules Committee analysis indicated that problems were noted because mental health treatment can be a lifetime proposition, but that with the high market penetration of managed care in California, there was no danger that "frivolous and unchecked utilization of services [would] spiral out of control." (Sen. Rules Com., Rep. on Assem. Bill No. 88 (1999–2000 Reg. Sess.) as amended Aug. 17, 1999, p. 7.)

The Enrolled Bill Report for Assembly Bill No. 88 dated September 8, 1999, stated that the costs of additional mental health care would be offset by savings in other areas, such as the criminal justice system.

Senate Bill No. 468 was a competing parity bill during the 1999–2000 session, but was not passed. Senate Bill No. 468, introduced February 17, 1999, would have added a version of section 1374.72 containing core provisions nearly identical to those in Assembly Bill No. 88. (Sen. Bill No. 468 (1999–2000 Reg. Sess.) as introduced Feb. 17, 1999.) A subsequent version of Senate Bill No. 468 bill defined mental illness to include mental disorders defined in the Diagnostic and Statistical Manual IV (DSM IV) and permitted plans to exclude coverage for services that were "not medically necessary or clinically appropriate." (Sen. Bill No. 468 (1999–2000 Reg. Sess.) as amended Mar. 22,

27

1999.)  Most significantly, the version of Senate Bill No. 468 dated March 22, 1999—specifically permitting exclusion of coverage for residential treatment—dropped that exclusion from a later version dated April 27, 1999.  (Sen. Bill No. 468 (1999–2000 Reg. Sess.) as amended Mar. 22, 1999, and Apr. 27, 1999.)

In related legislation in 2011, the Legislature added section 1374.73 to the Parity Act to mandate coverage for behavioral health treatment for autism.  (§ 1374.73, subd. (a)(1).)  (Stats. 2011, ch. 650, § 1.)  Section 1374.73 contains a sunset provision and expires on January 1, 2017.  (§ 1374.73, subd. (g).)  Whether section 1374.73 permitted the use of unlicensed therapists who were nonetheless certified in a specific type of treatment for autism was the issue before the court in *Consumer Watchdog*, *supra*, 225 Cal.App.4th 862.

### (2)    Discussion

"[R]eading the tea leaves of legislative history is often no easy matter.  Even assuming there is such a thing as meaningful collective intent, courts can get it wrong when what they have before them is a motley collection of author's statements, committee reports, internal memoranda and lobbyist letters.  Related to this problem . . . [is the fact] that legislators are often 'blissfully unaware of the existence' of the issue with which the courts must grapple, and . . . ambiguity may be the deliberate outcome of the legislative process.  In light of these factors, the wisest course is to rely on legislative history only when the history itself is unambiguous." (*J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1578, fn. omitted.)

The tea leaves of Assembly Bill No. 88 offer little insight into the specific issue of whether residential care was intended to be included or excluded as a benefit required under the Parity Act.  Most of the debate in the legislative history centers on costs versus social benefits and not whether specific treatments will be required by the Parity Act. The legislative history indicates that insurers such as Blue Shield were concerned that costs would spiral out of control, but the CPA's comment that the medically necessary provision would limit the scope of mental health benefits is consistent with our statutory

analysis. Furthermore, Senate Bill No. 468 specifically added and deleted residential treatment, indicating the Legislature was well aware of this standard of care and that it had an available mechanism by which to exclude residential care expressly from the Parity Act. Finally, the lack of focus in the legislative history of Assembly Bill No. 88 on residential treatment is consistent with the broad language of the Parity Act and the guiding principle of "medical necessity" as opposed to "basic health care" services to limit what health care services were and were not required.

### E. Statutory Purpose: Evils to be Remedied

Blue Shield contends the *Harlick* court erred when it asserted that the Parity Act and the Knox-Keene Act operate in fundamentally different ways because the Parity Act is part of the Knox-Keene Act and was not intended to be fundamentally different from the Knox-Keene Act but was intended to create and enforce parity in coverage under the Knox-Keene Act; things which are fundamentally different cannot be in parity. Furthermore, it would be illogical to construe the Knox-Keene Act to provide limitless coverage for mental illnesses, while limiting coverage for physical illnesses.

This argument misunderstands *Harlick*'s reasoning and fails to see that the Parity Act, in fact, places limits on coverage. *Harlick*, *supra*, 686 F.3d 699 stated that the Parity Act and the Knox-Keene Act operate in fundamentally different ways because mandated coverage under the Parity Act applies to nine specified "'severe'" mental illnesses and does not mandate coverage for nonsevere mental illnesses; in contrast, the Knox-Keene Act mandates coverage for all physical illnesses, severe or otherwise. *Harlick* concluded this difference was the source of the limitations of required coverage for mental and physical illnesses. In brief, the Parity Act limited insurer liability by "limiting the illnesses to which it applies, not by limiting medically necessary treatments," while the Knox-Keene Act limited "insurer liability by limiting medically necessary treatments." (*Id*. at p. 716.)

29

## F. Policy

Blue Shield makes two policy arguments. First, it contends that plaintiffs' interpretation ignores the economic impact on the California health care market. The Knox-Keene Act reflects the legislative balance in requiring coverage for certain types of basic care and leaving everything else to the market to permit parties to choose whether to offer more benefits at a higher price or fewer benefits at a lower price. Further, Blue Shield asserts that comparing the Parity Act to other states' laws shows that the Legislature did not intend to mandate coverage of residential treatment for eating disorders. (See, e.g., N.D. Cent. Code § 26.1-36-09, subd. (2)(a); Mont. Code Ann. § 33-22-705.) The California Legislature recognized that it was aware of the laws of other states (see, e.g., Assem. Com. on Health, Analysis of Assembly Bill No. 88 (1999–2000 Reg. Sess.) as amended Feb. 24, 1999, p. 4) yet it chose not to include residential treatment in California's law.

We disagree. Blue Shield's construction would exclude one of the most effective treatments for anorexia and bulimia, one of the primary legislative purposes of the Parity Act will be thwarted because victims of eating disorders will not receive effective treatment, resulting in needless mental suffering and physical deterioration. Blue Shield's construction contradicts the legislative findings because it would result in the loss of productivity and increased physical illness of individuals with eating disorders.

## G. DMHC's Conduct and Position

In spite of all of the above, Blue Shield argues that DMHC's actions and position taken in multiple situations demonstrates the DMHC interprets the Parity Act in a manner consistent with Blue Shield's position. We do not find DMHC's actions and positions taken with respect to residential treatment have the significance Blue Shield attributes to them.

For example, during the comment period on the proposed regulation, Blue Shield expressed concern that the regulation might be read to require coverage for all medically necessary care even if it were not a basic health care service. DMHC stated, "Given that

30

the statute requires parity in coverage, [Blue Shield's] concern is without merit; the regulation requires only that health plans provide mental health coverage in parity with what the plan provides for other medical conditions. The draft regulation language makes clear that plans cannot limit mental health coverage to anything less than what is medically necessary and on parity with other health coverage provided by the plan."

In addition, Blue Shield argues DMHC licensed Blue Shield's plans that expressly excluded residential treatment, and DMHC's surveys indicate that it does not view a plan's exclusion of residential treatment a violation of the Parity Act. Such surveys are mandated by section 1380 and constitute the primary method by which the DMHC enforces the Knox-Keene Act.

We are not bound by an administrative agency's position where, as here, it contradicts the language of the statute. We recognize that when an administrative agency is charged with administering a statute or ordinance, the administrative agency's interpretation of the applicable law is given great deference by the reviewing court. (*Cole v. City of Oakland Residential Rent Arbitration Bd.* (1992) 3 Cal.App.4th 693, 697–698.) While agency interpretation of the meaning and legal effect of a statute or the agency's regulation is entitled to consideration and respect by the courts, courts must independently judge the text of a statute. Further, the weight accorded to an agency's interpretation is "fundamentally situational" and "turns on a legally informed, commonsense assessment of [its] contextual merit." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12, 14.) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Id*. at p. 7.) The degree of deference accorded is dependent in large part upon whether the agency has a "'comparative

31

interpretative advantage over the courts'" and on whether it has arrived at the correct interpretation. (*Id.* at p. 12.)

Here, as discussed above, we do not follow DMHC's interpretation or actions that purportedly reflect its view that the Parity Act does not cover residential treatment because we conclude such an interpretation is contrary to the Parity Act.

### H.    Conclusion

In summary, we conclude that the language and background of the Parity Act establish that residential treatment for eating disorders must be covered by health care service plans such as Blue Shield's plan. We do not interpret the concept of "parity" to require treatments for mental illnesses to be identical to those mandated for physical illnesses; rather, given the principle that treatments for the two types of illnesses are in many cases not comparable, parity instead requires treatment of mental illnesses sufficient to reach the same quality of care afforded physical illnesses. We finally observe that where more than one statutory construction is arguably possible, the ""'"policy has long been to favor the construction that leads to the more reasonable result."'"" (*Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 555.) We consider ""'"the consequences that will flow from a particular interpretation"'"" while avoiding a construction that would "'"lead to unreasonable, impractical or arbitrary results.'" (*Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290.) In that regard, those persons whose insurers and plans currently provide coverage for residential treatment of eating disorders could find themselves without such coverage, and we are loathe to upend this longstanding expectation of coverage. We therefore find no legal basis to disrupt this reasonable and established interpretation of a statute that has been in effect for 14 years by adopting Blue Shield's interpretation of the Parity Act to exclude such coverage.

If the Legislature disagrees with our analysis, it can amend the Parity Act to set forth a particularized exclusion for residential treatment. As evidenced by section

32

1374.73, when the Legislature wants to specifically address the scope of health care services under the Parity Act, it speaks with precision.

## DISPOSITION

The judgment is reversed.  Appellants are to recover their costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.