Filed 9/22/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| 926 NORTH ARDMORE AVENUE, LLC, | B248536 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC476670) |
| v. | |
| COUNTY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rita Miller, Judge.  Affirmed.

Goodson Wachtel and Petrulis and Lemoine Skinner III, for Plaintiff and Appellant.

John F. Krattli, County Counsel and Albert Ramseyer, Principal Deputy County Counsel, for Defendant and Respondent.

_____

BA Realty, LLLP[1] owned 926 North Ardmore Avenue LLC (Ardmore), a single member entity established to hold and manage an apartment building. In 2008, the owners of BA Realty sold approximately 90% of their partnership interests, 45% to each of two trusts. Following the sale, the County of Los Angeles Registrar-Recorder sent a notice demanding that Ardmore pay a documentary transfer tax (see Revenue and Taxation Code, §§ 11911 *et seq*.) based on the value of the apartment building. The notice asserted that the cumulative sale of more than 50% of BA Realty (which owned Ardmore) qualified as a "change of ownership" of the apartment building, thereby triggering a documentary transfer tax.

Ardmore paid the demand and filed a tax refund action arguing that Revenue and Taxation Code section 11911 does not authorize a documentary transfer tax based on the change in ownership of a legal entity that owns the legal entity that holds title to realty. Following a bench trial, the court entered judgment in favor of the County. We affirm, concluding that section 11911 permits a documentary transfer tax when a transfer of interest in a legal entity results in a "change of ownership" within the meaning of Revenue and Taxation Code section 64, subdivision (c) or (d).

## FACTUAL BACKGROUND

### A. *Summary of Events Preceding the County Recorder's Tax Payment Demand*

In 1972, Beryl and Gloria Averbrook established a family trust that owned, among other things, an apartment building located at 926 North Ardmore Avenue (the apartment building). The family trust provided that, upon the death of the first spouse, an administrative trust was to be established that would distribute the trust principal to the following subtrusts: the "Survivor's Trust", the "Bypass Trust", the "Exempt Marital Trust" and the "Nonexempt Marital Trust." The surviving spouse was to be the beneficiary of each of the subtrusts. Beryl died in April of 2007, leaving Gloria as the beneficiary of the family administrative trust (the family trust) and the subtrusts. Gloria

---

[1]     BA Realty is described in its operating agreement as a "limited liability limited partnership."

designated her two sons, Bruce and Allen Averbrook, as successor trustees of the family trust.

In August of 2008, Bruce and Allen, acting in their capacity as trustees, established 926 North Ardmore LLC (Ardmore) to "acquire, hold, manage and dispose of" the apartment building. The family trust was named as the sole member of Ardmore, which elected to be disregarded as an entity separate from its owner for state and federal income tax purposes. (See generally Cal. Code Regs., tit. 18, § 23038, subd. (b); 26 C.F.R. § 301.7701-2, subd. (c)(2) [permitting single owner limited liability companies to elect whether to be recognized or disregarded for tax purposes as an entity separate from their owners].) The family trust later conveyed the apartment building to Ardmore, and then transferred its interest in Ardmore to a trust-owned partnership named BA Realty, LLLP.

In December of 2008, the family trust and its subtrusts entered into an agreement for the distribution of the family trust assets. Under the agreement, the family trust distributed its interest in BA Realty among the subtrusts as follows: 65% to the Survivor's Trust; 24% to the Nonexempt Marital Trust, 10% to the Bypass Trust and 1% to the Exempt Marital Trust. The same day the distribution agreement was executed, Gloria established an irrevocable trust for her son Allen (Allen's Trust) and a second irrevocable trust for her other son Bruce (Bruce's Trust). In January of 2009, Gloria directed the Survivor's Trust to distribute a 3.5% interest of BA Realty to each of her sons' trusts. Shortly thereafter, the Survivor's Trust and the two marital trusts each agreed to sell 50% of their interests in BA Realty to Allen's Trust and their remaining 50% interest to Bruce's Trust. Following these sales, the Allen and Bruce Trusts each held approximately 45% of the total interests in BA Realty.

Ardmore reported these sales to the State Board of Equalization through a "statement of change in ownership of legal entities." (See Rev. & Tax. Code, §§ 480.1 &

3

480.2**2** [requiring individuals and entities to file a statement with the Board when a transfer of interests in a legal entity results in a "change of ownership" within the meaning of section 64, subdivisions (c) or (d)].) Ardmore's statement asserted that the family trust's initial distribution of BA Realty (which owned Ardmore) to the various subtrusts did not qualify as a "change of ownership" of Ardmore's real property because Gloria remained the beneficial owner of the property through her status as beneficiary of the subtrusts. The statement further indicated, however, that the subtrusts (other than the Bypass Trust) had subsequently transferred one-half of their interests in BA Realty to each of Bruce's trust and Allen's trust. The statement did not take a position as to whether this subsequent transfer constituted a "change of ownership" under the relevant property tax provisions.

Based on the statement of change in ownership, the Office of the Assessor for the County of Los Angeles sent Ardmore a notice of supplemental property tax indicating there had been a "change in ownership" of Ardmore's real property, thereby triggering a property tax reassessment. Ardmore paid the supplemental reassessment tax without objection.

### B. The County Recorder's Notice of Documentary Transfer Tax Assessment

In 2011, the Registrar-Recorder/County Clerk for the County of Los Angeles (the recorder) sent a notice demanding that Ardmore pay a documentary transfer tax based on the value of the apartment building. The notice asserted the tax was due pursuant to section 11911 and Los Angeles County Code section 4.60.020, which permit the imposition of a tax on "each deed, instrument or writing by which any lands, tenements or other realty sold within the county of Los Angeles shall be granted, assigned, transferred or otherwise conveyed to or vested in the purchaser or purchasers . . ." The recorder asserted that the "change in ownership" of the legal entity that controlled Ardmore had "created a liability for the documentary transfer tax."

---

**2**      Unless otherwise noted, all further statutory references are to the Revenue and Taxation Code.

4

Ardmore paid the tax demand (approximately $11,000) and filed a claim with the County seeking a refund. Ardmore argued the subtrusts' sale of more than 50% of BA Realty did not support a documentary transfer tax assessment for two reasons. First, it asserted that the sale of a partnership that owns a single member limited liable company that holds title to realty does not constitute "realty sold" within the meaning of section 11911 or County Code section 4.60.020. Ardmore contended that although section 11925 permitted the recorder to impose a tax on transfers of controlling interests in partnerships that "hold realty," that section was inapplicable because BA Realty did not hold title to any realty; instead, it owned an LLC that held title to realty.

As its second ground, Ardmore argued that the subtrusts' sale of BA Realty to the Bruce and Allen trusts should not be categorized as a taxable transfer or sale. Ardmore contended that, under federal income tax rules, Gloria Averbrook was considered the owner of both of her sons' irrevocable trusts because she had retained the right to reacquire any property within those trusts and replace it with property of equal value. Ardmore further asserted that, as a result, the subtrusts' sale of a majority interest in BA Realty to the Allen and Bruce trusts was effectively a sale by Gloria to herself. The County rejected Ardmore's refund claim.

### C. *Summary of Trial Court Proceedings*

On January 10, 2012, Ardmore filed a complaint for a tax refund asserting that the recorder had an illegal policy of enforcing the documentary transfer tax on transfers of controlling interests in legal entities that either hold title to real property or own other legal entities that hold title to property. According to Ardmore, the Revenue and Taxation Code only permitted a transfer tax "on the sale of real property and not on the sale of legal entities, except for sales of interests in partnerships holding real property that result in the termination of the partnerships . . ." As in its claim for refund, Ardmore argued in the alternative that there had been no "sale" of a controlling interest in BA Realty because Gloria was treated as the legal owner of the subtrusts and the Bruce and Allen Trusts under applicable federal income tax provisions. Ardmore's complaint also

5

sought attorneys fees under Code of Civil Procedure section 1021.5, arguing that the action would result in the enforcement of an important public right and confer a significant benefit on the general public.

At trial, an employee of the county recorder testified that, in 2010, the County of Los Angeles had started assessing a documentary transfer tax whenever a legal entity had undergone a change of ownership within the meaning of state property tax law. The witness confirmed that this policy was set forth in a statement published on the County Recorder's website:

"NOTICE - COLLECTION OF DOCUMENTARY TRANSFER TAX FOR LEGAL ENTITY CHANGES IN OWNERSHIP

The Los Angeles County Registrar-Recorder/County Clerk ('RRCC') began enforcing collection of Documentary Transfer Tax ('DTT') on legal entity transfers where no document is recorded, but which resulted in a greater than 50% interest in control of the legal entity being transferred. The collection is made pursuant to Chapter 4.60 of the Los Angeles County Code, and California Revenue and Taxation Code ('RTC') sections 11911 and 11925, and is consistent with case law which defines 'realty sold' as having the same meaning as changes in ownership for property tax purposes in RTC section 64(c)(1). In addition, effective January 1, 2010, RTC section 408 was amended to allow recorders to obtain information pertaining to these transfers from the Assessor. As a result, in an effort to collect the tax, the RRCC will continue to identify, and send notices for, properties where a change of ownership occurred which transferred a greater than 50% controlling interest in the legal entity thereby creating a liability for the DTT."

The witness explained that, prior to 2010, the county recorder had no way to enforce the documentary transfer tax against transfers of interests in legal entities that resulted in a "change of ownership" of real property. The witness explained that although taxpayers were required to file a statement of change in ownership of a legal entity to the Board of Equalization and the assessor (see §§ 480.1 & 480.2), the prior version of the tax code had prohibited the assessor from "shar[ing these statements] with the Registrar Recorder." The witness further explained that the law was changed in 2009

6

to provide the recorder to access to information regarding changes in ownership of legal entities. According to the witness, since the change in law had gone into effect, the recorder had been sending a documentary transfer tax demand whenever the assessor notified it there had been a transfer of interest in a legal entity that resulted in a "change of ownership."

At the conclusion of the trial, the court issued a written order in favor of the County. The court ruled that, under the Revenue and Taxation Code, the transfer of more than a 50% interest in a partnership permitted the recorder to "collect a documentary transfer tax on real property owned by a 'lower tier entity' of [the] partnership. . . . [Therefore,] a documentary transfer tax could be collected, even though the apartment building . . . was owned by [the] 'lower tier entity' [Ardmore] rather than the partnership [BA Realty] itself."

The court further ruled that "even if Ardmore had prevailed" on the merits, the court would not have awarded attorneys fees under Code of Civil Procedure section 1021.5 The court explained that the trial evidence showed the "transaction [at issue] was unique. Plaintiff did not point to a single transaction like it in which the County had collected documentary transfer tax on the real property of a 'lower-tier' entity' wholly-owned and controlled by an 'upper-tier entity,' based on a change of ownership of this kind." The court further explained that "if the County's decision ultimately is held to have been erroneous, the decision was reached through reasonable analysis of an issue of first impression in connection with an extremely complex transaction . . . This level of error, if any, should not result in the taxpayers of the County underwriting plaintiff's substantial attorneys fees." On March 8, 2013, the court entered a judgment of dismissal.

## DISCUSSION

The issue presented in this appeal is whether the recorder was permitted to impose a documentary transfer tax based on the transfer of more than 50% of the interest in a partnership that was the sole member of an LLC that held title to realty. Ardmore argues that a documentary tax may only be applied to "realty sold," which does not generally

7

include sales or transfers of legal entities that either hold title to realty or own separate legal entities that hold title to realty. According to Ardmore, section 11925 describes the only situation in which the transfer of interest in a legal entity may trigger a documentary tax, which is limited to sales or transfers of partnerships that directly hold title to realty. Ardmore contends section 11925 does not apply to this transaction.

The County, however, argues we should follow prior decisions that have construed the term "realty sold" in section 11911 to have the same meaning as the term "change of ownership" set forth in the property tax provisions. The County asserts that, based on these authorities, the documentary tax may be applied whenever there is a "change of ownership" in a legal entity within the meaning of section 64, subdivisions (c) and (d). It further asserts that because Ardmore has admitted the subtrusts' sale of more than a 50% interest in BA Realty to the Bruce and Allen Averbrook trusts constituted a "change of ownership" of Ardmore's real property under section 64, the transaction necessarily qualified as a "sale" of realty within the meaning of section 11911.

The parties have not identified any disputed issue of material fact, but disagree on the interpretation of the Documentary Transfer Tax Act. We therefore apply a de novo standard of review. (See generally *Shapiro v. Board of Directors* (2005) 134 Cal.App.4th 170, 178 ["We apply a de novo standard of review where, as here, our task consists of applying a statute to underlying facts that are not in dispute."].)

### A. *Summary of Statutes Governing the Documentary Transfer Tax and "Changes of Ownership" in Legal Entities*

#### 1. *History and summary of documentary transfer taxes on sales of realty*

##### a. *Prior federal documentary stamp taxes*

Prior to 1968, federal law imposed documentary stamp taxes on (among other things) transfers of capital stock and conveyances of land. Former section 29 U.S.C. section 4321 imposed a tax on the "sale or transfer of shares or certificates of stock," which was defined to include "shares or certificates of profits or of interests in property

or accumulations." (See former 29 U.S.C., § 4381, subd. (c).)[3] Former section 29 U.S.C. section 4361 imposed a separate tax on "each deed, instrument, or writing by which any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers. . ."

The federal stamp tax laws included a special provision for "changes in partnerships," which was set forth in former 29 U.S.C. section 4383. Subdivision (a) of the statute provided that "[i]n the case of any share, certificate, right, or realty held by a partnership, no tax shall be imposed under section 4321, . . . [or] 4361 by reason of any transfer of an interest in the partnership" if the partnership was "continuing" within the meaning of 29 U.S.C. section 708. Under section 4383, subdivision (b), a partnership that "terminate[d]" within the meaning of 29 U.S.C. section 708 was to be treated as "having transferred all shares, certificates and rights held by such partnerships at the time of such termination" and "having executed an instrument whereby there was conveyed, for fair market value . . . all realty held by the partnership of such termination." (Former 29 U.S.C., § 4383, subds. (b)(1) & (2).) Section 708, entitled "Continuation of partnership," provides that a partnership is considered "as continuing if it is not terminated." Under section 708, subdivision (2)(B), "termination" occurs if "within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits."

---

[3]    Ardmore has filed a motion requesting that we take judicial notice of 79 documents, most of which are legislative materials related to the former federal stamp tax, the state Documentary Transfer Tax Act and the County and City transfer taxes. We take judicial notice of items 1-13 (text and legislative history of the former federal stamp tax (former 26 U.S.C. §§ 4321 *et seq.*) and the Federal Excise Tax Reduction Act of 1954); items 17-18 (federal regulations implementing federal stamp tax act); items 23-28 (legislative history of the Documentary Tax Transfer Act, §§ 11911 *et seq.*); item 29 (legislative history of AB 1428 (Stats. 1999, c. 75 (A.B.1428), § 1)); and items 30-31 (legislative history of SB 816 (Stats. 2009, c. 622 (S.B. 816)). We deny Ardmore's request for judicial notice of the remaining documents because those materials are not relevant to our disposition of this matter. (See *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 [court "may decline to take judicial notice of matters that are not relevant to dispositive issues on appeal"].)

The federal documentary stamp taxes were repealed by the Excise Tax Reduction Act of 1965, 26 U.S.C. §§ 4041 *et seq.* (1965).  (See *In re 995 Fifth Ave. Associates, L.P.* (2d Cir. 1992) 963 F.2d 503, 510, fn. 3; *Texaco, Inc. v. U.S.* (5th Cir. 1980) 624 F.2d 20, 21, fn. 2.)  The repeal of the stamp tax on transfers of capital stock became effective on January 1, 1966; the repeal of the stamp tax on the sale of realty became effective on January 1, 1968.

### b.  *The California Documentary Transfer Tax Act*

In 1967, the California legislature enacted the "Documentary Transfer Tax Act," §§ 11901, *et seq.* (DTTA), which "replace[d] and was patterned after the [portion] of the Federal Stamp Act [applying] to conveyances."  (*Thrifty Corp. v. County of Los Angeles* (1989) 210 Cal.App.3d 881, 884 (*Thrifty*).)  The legislative history of the DTTA indicates that the Act was intended to "authorize counties . . . to levy a tax upon the transfer of real property."  (Legis. Analyst, analysis of Sen. Bill. No. 837 (1967 Reg. Sess.) May 9, 1967.)

Several of the DTTA's provisions are substantially similar to the portion of the prior federal stamp tax on conveyances of real property on which it was modeled.  Section 11911, which is patterned after former 29 U.S.C. section 4361, provides:  "The board of supervisors of any county or city and county, by an ordinance adopted pursuant to this part, may impose, on each deed, instrument, or writing by which any lands, tenements, or other realty sold within the county shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers. . . ."

Sections 11921-11931 list numerous "exemptions" to the transfer tax, most of which are patterned on similar exemptions that had appeared in the now-expired federal stamp tax.  Section 11925, patterned on former 29 U.S.C. section 4383, sets forth an exemption for "any realty held by a partnership."  As originally enacted in 1967, the section stated:

10

(a)  In the case of any realty held by a partnership, no levy shall be imposed pursuant to this part by reason of any transfer of an interest in the partnership, if both of the following occur:

  (1)  The partnership is considered a continuing partnership within the meaning of Section 708 of the Internal Revenue Code of 1986.

  (2)  The continuing partnership or other entity treated as a partnership continues to hold the realty concerned.

(b)  If there is a termination of any partnership within the meaning of Section 708 of the Internal Revenue Code of 1986, for purposes of this part, the partnership or other entity shall be treated as having executed an instrument whereby there was conveyed, for fair market value . . . all realty held by the partnership.

Section 708 of the Internal Revenue Code has not been amended since the expiration of the federal tax stamp. The section continues to define any partnership that has not terminated as continuing, and defines termination to include a transfer of more than a 50% interest in the partnership's capital and profits within a 12-month period.

In 1999, the California Legislature adopted AB 1428, which amended section 11925 in two ways. (Stats. 1999, c. 75 (A.B. 1428), § 1.) First, it expanded the exemption's application to partnerships and "other entit[ies] treated as a partnership for federal income tax purposes." Second, the Legislature added subdivision (d): "No levy shall be imposed pursuant to this part by reason of any transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title to the realty and in which proportional ownership interests in the realty, whether represented by stock, membership interest, partnership interest, cotenancy interest, or otherwise, directly or indirectly, remain the same immediately after the transfer."

The Legislative Counsel's Digest comments accompanying AB 1428 explained that "Existing law authorizes counties and cities and counties to impose a documentary transfer tax at a specified rate upon deeds, instruments, or other writings by which specified property is transferred. Existing law exempts from the imposition of that tax,

11

for any realty held by a partnership, the transfer of an interest in a partnership under specified conditions. [¶] This bill would additionally make that exemption applicable to an entity treated as a partnership for federal income tax purposes. [¶] This bill would also preclude the imposition of that tax by reason of any transfer between an individual or individuals and a legal entity or between legal entities that results solely in a change in the method of holding title to the realty and in which proportional ownership interests in the realty . . . remain the same immediately after the transfer." (Stats. 1999, c. 75 (A.B.1428), § 1.)

> c. *The County of Los Angeles and City of Los Angeles transfer tax provisions*

The County of Los Angeles and the City of Los Angeles have each adopted ordinances imposing a documentary transfer tax authorized under section 11911. The language of the ordinances are essentially identical to the provisions set forth in the DTTA. For example, Los Angeles County Code (L.A.C.C.) section 4.60.020 imposes a tax on "each deed, instrument, or writing by which any lands, tenements, or other realty sold within the county shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers . . ." The County Code contains additional sections that reflect each of the exemptions to the transfer tax described in the DTTA, including the partnership provisions set forth in section 11925. Identical provisions appear in the Los Angeles City Municipal Code, differing only in the amount of the tax rate. (See L.A.M.C. §§ 21.9.2 [imposing tax]; 21.9.8 [partnership exemption].)

Under the County and City codes, the County Recorder is responsible for administering the documentary transfer tax on behalf of the County and the City. (L.A.C.C. § 4.60.110; L.A.M.C., § 21.9.9.)

> 2. *Summary of California property tax provisions governing "change in ownership" of legal entities*

Under the California Constitution, real property is reappraised for property tax purposes when purchased or when a "change in ownership" occurs. (See Cal. Const. art.

XIIIA, § 2(a).) The Revenue and Taxation Code sets forth detailed provisions describing what type of transfers constitute a "change of ownership" that triggers reassessment. (See §§ 60-69.5; *Holland v. Assessment Appeals Bd. No.* 1 (2014) 58 Cal.4th 482, 485 ["The task of defining when there has been a change in ownership that triggers reassessment has been left largely to the Legislature. [Citation.]"].) Under section 60, the term "change of ownership" is generally defined to "mean[] a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest."

The tax code and the implementing regulations set forth numerous provisions governing transfers of property involving legal entities. The implementing regulations state that "[t]he transfer of any interest in real property to a corporation, partnership, limited liability company, or other legal entity is a change in ownership of the real property interest transferred." (Cal. Code. Regs., tit. 18, § 462.180, subd. (a); see also § 61, subd. (j).) Section 62, subdivision (a)(2), however, excludes from the definition of "change of ownership" any "[t]ransfers of . . . interests in legal entities between legal entities or by an individual to a legal entity (or vice versa) which result solely in a change in the method of holding title and in which proportional ownership interests of the transferors and transferees . . . remain the same after the transfer." (Cal. Code. Regs., tit. 18, § 462.180, subd. (d)(4); § 62, subd. (a)(2).) The implementing regulations describe such transfers as "Excluded Proportional Interest Transfers." (Cal. Code. Regs., tit. 18, § 462.180, subd. (d)(4).)

Section 64 describes when the transfer of interest in a legal entity qualifies as a "change in ownership" of the entity's real property. Subdivision (a) provides, in relevant part: "Except as provided . . . in subdivisions (c) and (d) of this section, the purchase or transfer of ownership interests in legal entities, such as corporate stock or partnership or limited liability company interests, shall not be deemed to constitute a transfer of the real property of the legal entity. . . ."

Section 64, subdivision (c)(1) provides, in relevant part, that when a single person or entity obtains a majority ownership interest in any partnership or limited liability

13

company through the purchase or transfer of partnership or limited liability company interest, "including any purchase or transfer of 50 percent or less of the ownership interest through which control or a majority ownership interest is obtained, the purchase or transfer of . . . [that] interest shall be a change of ownership of the real property owned by the . . . partnership [or] limited liability company . . . in which the controlling interest is obtained." The implementing regulations describe this as a change in "control" of the legal entity. (Cal. Code. Regs., tit. 18, § 462.180, subd. (d)(1).)[4]

Section 64, subdivision (d) describes when the transfer of more than a 50% interest in a legal entity that does not result in any single individual or entity obtaining majority ownership nonetheless qualifies as a "change in ownership." The subdivision states, in part, that if property is transferred to a legal entity in a transaction "excluded from change in ownership by [section 62, subdivision (a)(2)]"—i.e. "excluded proportional interest transfers"—"the persons holding ownership interests in that legal entity immediately after the transfer shall be considered the 'original coowners.'" Subdivision (d) further provides that if the original coowners subsequently transfer "interests cumulatively representing more than 50 percent of the total interests in the entity . . . in one or more transactions, a change in ownership of that real property owned by the legal entity shall have occurred, and the property that was previously excluded from change in ownership under the provisions [of section 62, subdivision (a)(2)] shall be

---

**4** The implementing regulations provide the following example regarding the application of section 64, subdivision (c): "A and B each own 50 percent of the stock of Corporation X. Corporation X acquires White acre from Corporation Y, an unaffiliated corporation in which neither A nor B has interests, and White acre is reappraised upon acquisition. A transfers 30 percent of Corporation X's stock to C, and B later transfers 25 percent of Corporation X's stock to C. Upon C's acquisition of 55 percent of Corporation X's stock, there is a change in control of Corporation X under Section 64(c) and a reappraisal of White acre." (Cal. Code. Regs., tit. 18, § 462.180, subd. (d).)

reappraised."[5]  The implementing regulations describe this as the "Transfers of More than 50 Percent" rule.  (Cal. Code. Regs., tit. 18, § 462.180, subd. (d)(2).)[6]

Thus, section 64 describes two situations in which the purchase or transfer of interests in legal entities is deemed to constitute a "change of ownership" of real property owned by the legal entity or its sub-entity.  First, a change of ownership is deemed to occur under subdivision (c) when a single individual or entity obtains, in one or more transactions, majority control of a legal entity that holds title to realty or owns separate legal entities that hold title to realty.  Second, under subdivision (d), a change of ownership occurs when:  (1) real property is transferred to a legal entity in an "excluded proportional interest transfer" governed by subdivision 62, subdivision (a)(2); and (2) the original coowners of the legal entity thereafter transfer more than 50% of the interests in the legal entity in one or more subsequent transactions.

---

[5]  Subdivision (d) clarifies, however, that any transfer of ownership interests "that results in a change in control" of a partnership or limited liability company "is subject to reappraisal as provided in subdivision (c) rather than this subdivision."

[6]  The implementing regulations provide the following example regarding the application of section 64, subdivision (d):  "A and B, hold equal interests as tenants in common in Greenacre, a parcel of real property.  A and B transfer Greenacre to Corporation Y and in exchange A and B each receive 50 percent of the corporate stock.  No change in ownership pursuant to Section 62(a)(2).  Pursuant to Section 64(d), A and B become original coowners.  A transfers 30 percent of Corporation Y's stock to C (A's child), and B then transfers 25 percent of Corporation Y's stock to D (B's grandchild).  Change in ownership of Greenacre upon B's transfer to D. . ."  (Cal. Code. Regs., tit. 18, § 462.180, subd. (d).)

The regulations also contain an example highlighting relevant elements of section 64 subdivisions (c) and (d):  "Spouses H and W acquire as community property from the current owners, who are not original co-owners, 100% of the capital and profits interests in an LLC which owns Blackacre.  Each of H and W is treated as acquiring 50 percent of the ownership interests as defined in subdivision (c) and Revenue and Taxation Code Section 64(a).  No change in control of the LLC; no change in ownership of Blackacre."  (Cal. Code. Regs., tit. 18, § 462.180, subd. (d).)

15

### 3. *Statutory requirements regarding statements of change in ownership of legal entities*

Revenue and Taxation Code sections 480.1 and 480.2 require the filing of a statement whenever there has been a change in ownership of a legal entity within the meaning of section 64 subdivision (c) or (d). Section 480.1 states, in relevant part: "Whenever there is a change in control of any [legal entity], as defined in subdivision (c) of Section 64, a signed change in ownership statement . . . shall be filed by the person or legal entity acquiring ownership control of the [legal entity] with the [State Board of Equalization]." Section 480.2 similarly provides: "Whenever there is a change in ownership of any [legal entity], as defined in subdivision (d) of Section 64, a signed change in ownership statement . . . shall be filed by the [legal entity] with the [State Board of Equalization]." Section 482 imposes a penalty for failure to file a statement required under section 480.1 or 480.2 within 90 days of the change in control or ownership.

If the Board of Equalization determines a change in control or ownership has occurred, it disseminates the information to the county assessor to permit a reassessment of the real property interests. According to the Board of Equalization, this information sharing "is necessary because, ordinarily, transfers of ownership interests in legal entities do not involve a recorded deed or other notice that would inform county assessors" that a change in ownership has occurred. (See http://www.boe.ca.gov/proptaxes/leop.htm.[7])

Prior to 2009, Revenue and Taxation Code sections 408 and 481 barred the assessor from providing county recorders access to statements of change in ownership of legal entities. Section 481 prohibited the assessor and the board from permitting

---

[7] This statement appears on a section of the Board of Equalization's website discussing its "Legal Entity Ownership Program" (LEOP). We may take judicial notice of the Board's description of the LEOP set forth on its website. (See Evid. Code, § 452, subd. (c); *Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577, 606, fn. 10 [taking judicial notice of diagrams and definitions set forth on the "Department of Transportation's Web site" pursuant to Evid. Code, § 452, subds. (c) & (h)]; *People v. Kelly* (2013) 215 Cal.App.4th 297, 304, fn. 4. [permitting judicial notice of statements on websites of state agencies pursuant to Evidence Code, § 452, subd. (c)].)

16

inspection of change in ownership statements "except as provided in section 408." Section 408 subdivision (a) generally prohibited the assessor from permitting inspection of any records in his or her possession that are not otherwise required to be made public by law. Although section 408, subdivision (b) required the assessor to provide access to "all records in his or her office" to certain categories of government entities (law enforcement, grand juries, etc.), county recorders were not included.

In 2009, the Legislature adopted SB 816, which made several amendments to section 408 and the statement of change in ownership reporting requirements set forth in sections 480.1, 480.2 and 482. (Stats. 2009, c. 622 (S.B. 816).) First, SB 816 amended section 408, subdivision (b) by requiring the assessor to provide access to his or her record to "the county recorder when conducting an investigation to determine whether a documentary transfer tax is imposed." Second, SB 816 shortened the time period for filing statements of change in ownership of legal entities from 90 days to 45 days. Third, the bill amended the penalty provisions for failing to file the statement set forth in section 482. Prior to the amendment, the penalty could only be applied if the person or entity failed to respond to a written request for the statement from the Board of Equalization. In addition, the penalty was automatically extinguished if the person or entity filed a change in ownership statement within 60 days of receiving notification that a penalty had been assessed. SB 816 amended section 482 by removing the "extinguishment" provision and making the penalty applicable if the statement was not filed within 45 days of the change in ownership or control. Thus, SB 816 made two general changes to the law: (1) it provided county recorders access to assessors' records, including statements of change in control and ownership of legal entities, and (2) it shortened the time to file statements of change in control or ownership of a legal entity and imposed an automatic penalty if the statement was not filed within 45 days of the change of control or ownership.[8]

---

[8] In 2011, sections 480.1, 480.2 and 482 were amended again to make the penalty applicable if the statement of change in control of ownership of a legal entity was not filed within 90 days of the change in ownership. (See Stats. 2011, c. 708 (S.B. 507).)

The Senate Revenue and Taxation Committee's analysis of SB 816 provided the following explanation for the legislation: "The Documentary Transfer Tax . . . allows cities and counties to enact taxes on documents that serve to transfer real property. . . . SB 816 provides a firmer deadline to file change of ownership statements and removes a sixty day grace period, thereby encouraging taxpayers to file the legally required forms, which may or may not trigger the [documentary transfer tax].  Additionally, by providing access to assessor information, SB 816 will help recorders determine whether the [documentary transfer tax] applies to certain changes of ownership."  The analysis further provided that the committee believed SB 816 would "result in some increased revenue for local agencies as a result of increased [Documentary Transfer Tax] collections . . ." (Senate Rev. and Tax. Comm., summary of Sen. Bill No. 816 (Reg. Session 2009-2010.) April 22, 2009, pp. 3-4.)

Two years after SB 816 was passed, the Legislature adopted AB 563, which added section 408.4 (Stats. 2011, c. 320 (A.B. 563), § 1.)  Section 408.4 requires the assessor to "permit access to all records in his or her office to designated employees of a city's finance office when conducting an investigation to determine whether a documentary transfer tax should be imposed for an unrecorded change in control or ownership of property."  An analysis of AB 563 prepared by the Senate Rule Committee explained: "Two years ago, the Legislature required the assessor to disclose information . . . and permit access to all records to the County Recorder when conducting an investigation to determine whether the documentary transfer tax is due.  The City of Los Angeles wants the Assessor to share this information with city financial officials to help assess the [documentary transfer tax]."  (Sen. Rules Com, Sen. Floor Analyses, 3d reading analysis of Assem. Bill. No. 563 (2011-2012 Reg. Sess.) August 29, 2011, pp. 2-3.)

### B. The DTTA Authorizes a Transfer Tax When There Has Been a "Change in Ownership" of a Legal Entity, Subject to the Limitations Set Forth in Section 11925

Using the above statutory framework as our guide, we must assess whether the sale of more than a 50% interest in a partnership that owns a single-entity limited liability

18

company that holds title to realty constitutes "realty sold" within the meaning of section 11911.[9] Ardmore argues that section 11911 does not permit a tax under such circumstance because: (1) the transaction would not have been subject to taxation under the now-expired federal stamp tax (see former 26 U.S.C. section 4861) that served as the model for the DTTA; and (2) section 11925 of the DTTA, which applies when there is a transfer of more than 50% of a partnership that holds title to realty within a 12-month period, sets forth the only circumstance under which a transfer in interests of a legal entity constitutes a taxable event. Ardmore further contends that section 11925 does not apply to the transaction here because BA Realty did not "hold" title to realty; rather it owned a legal entity that held title to realty.

The recorder, however, argues we should adopt a broader interpretation of section 11911. Specifically, the recorder contends we should follow prior case law that has interpreted the term "realty sold" in section 11911 to have the same meaning as the phrase "change of ownership" as used in the property tax provisions. The recorder asserts that because the transfer of a 90% interest in BA Realty qualified as a "change of ownership" of the property held by Ardmore under section 64, the transfer necessarily qualified as the "sale" of realty within the meaning of section 11911.

### 1. *Summary of decisions defining the term "realty sold" to have the same meaning as "change of ownership"*

Several prior decisions have looked to the definitions of "change of ownership" set forth in the property tax provisions to aid in the interpretation of section 11911. In *Thrifty, supra*, 210 Cal.App.3d 881, the County of Los Angeles imposed a documentary transfer tax on a parcel of land that was leased to a corporation for 20 years with an option to extend the lease for an additional 10 years. The trial court ruled section 11911 did not apply "'to the recordation of leases or leasehold interests.'" (*Id*. at p. 883.) The

---

[9] The parties do not dispute that if section 11911 permits the imposition of a transfer tax under such circumstances, the tax is also permissible under the County and City transfer tax ordinances, which incorporate language that is essentially identical to section 11911.

"issue presented [on appeal was] when, if ever, can a leasehold interest in real property constitute 'realty sold' for purposes of triggering taxation under Revenue and Taxation Code section 11911." (*Id*. at p. 883.)

The court began its analysis by examining the legislative history of the statute, which indicated "the Legislature . . . intended to generally place leases outside of the scope of section 11911." (*Thrifty, supra*, 210 Cal.App.3d at p. 883.) The court further found, however, that interpretations of the former federal stamp tax on which section 11911 was patterned made clear that "a lease was subject to a [federal] transfer tax when it was of sufficient duration to approximate an interest such as an estate in fee simple or a life estate." (*Id*. at p. 885)

The court next considered whether, under California law, the specific lease at issue (a 20-year lease with a 10 year renewal option) was "of sufficient longevity . . . to approximate an "'ownership' right rather than a mere 'temporary right of possession.'" (*Thrifty, supra*, 210 Cal.App.3d at p. 885.) According to the court, "[t]he Legislature ha[d] . . . provided . . . guidance in making this determination. Revenue and Taxation Code section 61 . . . defines 'change in ownership' for property tax purposes in part as '[t]he creation of a leasehold interest in taxable real property for a term of 35 years or more (including renewal options).' [Citation.]" (*Ibid*.) The court explained that "[w]hile the Document Transfer Tax Act does not define 'realty sold' that phrase is sufficiently similar to the phrase 'change in ownership' contained in the same code and governing an analogous subject, to warrant that each phrase be defined to have the same meaning." (*Ibid*.)

In reaching its holding, the court rejected the County's assertion that, under the federal test, there was a "question of fact whether a lease of a shorter duration then that specified in section 61 approximates an interest in fee." (*Thrifty, supra*, 210 Cal.App.3d at p. 886.) The court explained: "The determination of what the Legislature intended when it employed the term 'realty sold' in section 11911 is a question of law. Since we conclude that the Legislature intended [the term 'realty sold' in section 11911] to be defined consistently with the phrase 'change of ownership' in section 61, as a matter of

law Thrifty's 20-year lease with an option to renew for 10 years was not of sufficient longevity to constitute 'realty sold' under section 11911."

Later, in *McDonald's Corporation v. Board of Supervisors* (1998) 63 Cal.App.4th 612 (*McDonald's*), a different appellate district considered whether an amendment to a lease that resulted in a remaining term of less than 35 years, but a total leasehold period of more than 35 years, was subject to the transfer tax. The court agreed with "*Thrifty's* h[olding] that the phrase 'realty sold,' left undefined in the Document Transfer Tax Act was 'sufficiently similar to the phrase "change in ownership" . . . to warrant that each phrase be defined to have the same meaning.' [Citation.]" (*Id.* at p. 616.) The court then analyzed various state regulations and opinion letters that had found a lease amendment resulting in a remaining term of less than 35 years did not constitute a "change of ownership" under the property tax provisions. The court concluded that because the amended lease did not qualify as a "change of ownership," there was no basis to impose a documentary transfer tax.

A year after *McDonald's* was decided, the Office of the Attorney General issued an opinion letter analyzing whether "a transfer of real property from a parent corporation to its wholly-owned subsidiary corporation constitutes 'realty sold' for purposes of section 11911." (82 Ops. Cal. Atty. Gen. 56 (March 26, 1999).)[10] The Attorney General noted that although "[t]he statute itself does not define the term," *Thrifty* and *McDonald's* had each "concluded that the term 'realty sold' as used in section 11911 should be construed to mean 'change in ownership' as the latter term has been defined by the Legislature for purposes of real property taxation."

The Attorney General adopted the same analysis, concluding that the transfer tax was inapplicable because there was no "change of ownership" within the meaning of the property tax laws: "Following . . . the judicial construction of the term 'realty sold' to

_____

[10]    The opinion letter was issued before the Legislature amended section 11925 to add subdivision (d), which clarified that the transfer tax was inapplicable to any transfer between legal entities "that results solely in a change in the method of holding title to the realty and in which proportional ownership interests in the realty . . . remain the same immediately after the transfer."

mean 'change in ownership,' we find that a transfer of real property from a parent corporation to a wholly-owned subsidiary corporation does not constitute a 'change in ownership.' (§[] 62, subd. (a)(2); [Citations.].) Even though a corporation has a legal status distinct from its officers and shareholders [citations], the transfer of real property from a parent corporation to a wholly-owned subsidiary corporation is not considered a transfer of control for purposes of a 'change in ownership' and hence cannot be so considered for purposes of the Act as 'realty sold.'"

2. *The term "realty sold" includes "changes of ownership" within the meaning of Revenue and Taxation Code section 64, subdivisions (c) and (d)*

We agree with *Thrifty* and *McDonald's* conclusion that where, as here, the DTTA does not directly address whether a particular type of transaction qualifies as "realty sold" within the meaning of section 11911, courts may look to the definitions of "change in ownership" set forth in the property tax provisions. As explained in *Thrifty*, under principles of statutory construction, similar terms used "in the same code and governing . . . analogous subject[s]" should generally "be defined consistently" unless "countervailing indications require otherwise." (*Thrifty, supra*, 210 Cal.App.3d at p. 886; see also 9 Witkin, Summary 10th (2005) Tax, § 320, p. 462 ["Although [§] 11911 does not define 'realty sold,' that phrase is sufficiently similar to the phrase 'change in ownership,' used in the Revenue Code and governing the analogous subject of property taxation, to warrant that each phrase be defined to have the same meaning"].)

The legislative history of the DTTA and the overall structure of the Revenue and Taxation Code support *Thrifty's* conclusion that section 11911 is generally intended to permit a transfer tax when there has been a "change of ownership" in the property. Section 60 defines "change in ownership" to "mean[] a *transfer* of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest." (Emphasis added). Although section 11911 refers to the "sale" of realty, the legislative history indicates the documentary transfer tax was intended to apply to any instrument reflecting a sale resulting in the "transfer" of real

22

property.  The Legislative Analyst's original analysis of the DTTA states that the Act would "authorize counties through enactment of an appropriate ordinance . . . to levy a tax upon the transfer of real property."  (Legis. Analyst, analysis of Sen. Bill. No. 837 (1967 Reg. Sess.) May 9, 1967.)  A Legislative Counsel opinion letter  reported that the act would "authorize counties and cities to impose a tax on documents evidencing a transfer of real property."  (Opinion of Legislative Counsel on Senate Bill No. 837 (August 1, 1967.)  Numerous other materials in the legislative history, including the Governor's "bill memorandum," a letter from the DTTA's author to the Governor and an analysis by the Department of Finance, contain virtually identical language, each referring to the DTTA as authorizing a "tax on the transfer of real property." (See Vernon L. Sturgeon, bill memorandum to Governor Reagan re Assem. Bill No. 837 (1967 Reg. Sess.) Aug. 18, 1967; Letter dated August 7, 1967 from Senator Stephen P. Teale to Governor Ronald Regan re Sen. Bill No. 837; Dept. of Finance Bill Analysis, Sen. Bill No. 837 (1967 Reg. Sess.) as amended July 31, 1967.)

The legislative history of subsequent bills amending or affecting the documentary transfer tax provisions similarly indicate the tax is intended to apply to sales resulting in the "transfer" of realty.  For example, the Legislative Counsel's Digest comments accompanying the 1999 amendments to the DTTA (which added § 11925, subd. (d) and expanded the exemption to entities treated as partnerships for purposes of federal income tax) state that the DTTA "authorizes counties and cities to impose a documentary transfer tax at a specified rate upon deeds, instruments, or other writings by which specified property is transferred."  (Stats. 1999, c. 75 (A.B.1428), § 1.)  Similar statements appear in the Legislative Counsel's Digest comments accompanying SB 816, which amended section 408 to provide county recorders access to the assessor's records when conducting an investigation to determine whether to impose a transfer tax (Stats. 2009, c. 622 (S.B. 816) [DTTA "authorizes . . . city and county to impose a tax upon specified instruments that transfer specified interests in real property"]), and in the Assembly floor analysis of AB 563 (Assem. Rev. and Tax. Com., Assem. Conc. Amends. To Assem. Bill No. 563, (2011-2012 Reg. Sess.) as amended August 29, 2011, p. 2 [DTTA "allows cities and

23

counties to enact, by ordinance, taxes on documents that serve to transfer real property']), which extended similar access to city employees. The fact that the Legislature has defined the term "change of ownership" to generally mean "a transfer of a present interest in real property," and has repeatedly referred to section 11911 as authorizing a tax on sales resulting in "transfers of real property" supports *Thrifty's* conclusion that the term "realty sold" should, in the absence of countervailing indications, be construed to have the same meaning as "change in ownership."

*Thrifty's* holding is also supported by recent changes in the law that suggest the Legislature endorses the view that a transfer tax may be imposed when there is a "change in ownership" of a legal entity under section 64, subdivisions (c) or (d). As discussed above, in 2011, the Legislature adopted AB 563, which required the assessor to provide information to city officials conducting an investigation to determine "whether a documentary transfer tax should be imposed for an unrecorded change in control or ownership of property." (§ 408.4.) The phrase "unrecorded change in control or ownership" mirrors the language the Legislature has used to describe the two forms of "change in ownership" of legal entities set forth in section 64, subdivision (c)–"change in control" of a legal entity (see § 480.1)—and section 64, subdivision (d)—"change in ownership" of a legal entity (see § 480.2). The Assembly floor analysis of AB 563 confirms that the bill was intended to enable "cities [investigating the imposition of the DTTA] to identify change of ownership legal entity transfers and other real property transfers that may not be currently captured." (Assem. Rev. and Tax. Com., Assem. Conc. Amends. To Assem. Bill No. 563, (2011-2012 Reg. Sess.) as amended August 29, 2011, p. 2.)

Two years earlier, the Legislature made a similar change to section 408, requiring that the assessor provide information to any county recorder investigating "whether a documentary transfer tax is [to be] imposed." Although the amendment to section 408 did not specifically refer to investigations regarding "change in control or ownership" of legal entities, the amendment was included in a bill (SB 816) that shortened the period for filing "statements of change in control or ownership of legal entities" and strengthened

the penalty provisions for failing to file such statements. Moreover, the legislative history of SB 816 indicates the amendment to section 408 was intended to enable county recorders to determine whether the transfer tax was applicable as the result of a "change[] of ownership." The language in the text and history of both SB 816 and AB 563 contain persuasive evidence that the Legislature intended to provide local officials the ability to impose the documentary transfer tax where an unrecorded transfer of interests in a legal entity has resulted in a "change in ownership" within the meaning of section 64, subdivisions (c) and (d).

We also find it instructive that the Legislature has taken no action in response to multiple court decisions and several local county ordinances that have specifically interpreted the DTTA to permit a transfer tax when a "change in ownership" has occurred. Although *Thrifty* was decided more than 25 years ago and *McDonald's* was decided more than 15 years ago, we are not aware of any subsequent conduct by the Legislature suggesting disapproval of those holdings. (*Cf. People v. Nasalga* (1996) 12 Cal.4th 784, 792 [refusing to overturn 31-year old decision, noting that "the Legislature ha[d] taken no action, as it easily could have done, to abrogate [the holding]"].)

Moreover, after *Thrifty* and *McDonalds* were decided, several counties announced that they would begin enforcing the transfer tax based on "changes in ownership" of legal entities. Los Angeles County announced its intent to enforce the tax under such circumstances through a statement published on its website in or around 2010. Before Los Angeles made this announcement, at least two other counties had already amended their local transfer tax ordinances to define "realty sold" to include any change in ownership of a legal entity within the meaning of section 64, subdivision (c) or (d). The County of Santa Clara adopted such an amendment in 2007 (see County of Santa Clara Code, § A30-39.6 [documentary transfer tax is imposed when a "change of ownership" occurs under the circumstances set forth in section 64, subdivision (c) or (d)]; San Francisco adopted a similar amendment through a ballot initiative approved by voters in 2008. (See City and County of San Francisco Business and Tax Regulations Code, Art. 12-C, § 1114 ["'realty sold' includes any acquisition or transfer of ownership interests in

25

a legal entity that would be a change of ownership of the entity's real property under California Revenue & Taxation Code § 64"].) Thus, for approximately five years, three of the largest counties in the state have been imposing the transfer tax based on the definitions of "change in ownership" set forth in section 64. The Legislature, in turn, has responded to these ordinances by passing multiple laws that are specifically designed to help counties determine when legal entity transfers have resulted in a "change in ownership." (See §§ 408, 408.4.)

### 3. *Ardmore has failed to demonstrate section 11911 does not permit a transfer tax based on changes in ownership*

Ardmore disagrees with our interpretation of section 11911, arguing that there are two reasons we should not consider the "change of ownership" definitions set forth in section 64 when construing the term "realty sold."

First, it contends that when interpreting section 11911, we should look solely to federal administrative regulations and decisions interpreting former 26 U.S.C section 4361, which imposed a federal stamp tax on conveyances of realty. Ardmore argues that because section 11911 was patterned on section 4361, we must look only to federal law to aid our interpretation. It further asserts there is no federal authority suggesting that former section 4361 was meant to apply to transfers of interests in corporate entities holding title to realty, other than transfers in partnerships that resulted in their termination.

We disagree with Ardmore's assertion that our interpretation of section 11911 is dependent only on federal laws that expired over 45 years ago. The state DTTA includes no language requiring that it be construed in the same manner as the federal statute it was designed to replace. Prior cases analyzing the meaning of section 11911 demonstrate that although federal interpretations of former section 4361 may aid in construing the DTTA under some circumstances, we are not bound by these federal interpretations. *People ex rel. Dept. of Public Works v. Santa Clara County* (1969) 275 Cal.App.2d 372 (*Santa Clara County*), which was decided shortly after the DTTA was adopted, is instructive. In

26

*Santa Clara County*, the court considered whether "transfers of realty effected by a court order issued pursuant to an eminent domain judgment involve[d] a sale within the meaning of [section 11911]." (*Id.* at p. 376.)  The court noted that the DTTA was patterned on the "similar federal [stamp] tax" and that "the federal government [had] never applied the tax to conveyances by condemnation." (*Id.* at p. 374, fn. 3.)  The court nonetheless concluded the tax did apply, citing (among other things) prior California decisions characterizing "a transfer of property by eminent domain [a]s a 'sale" (*id.* at p. 376) and the absence of any statutory language exempting condemnation orders from the transfer tax.

Similarly, in *Thrifty*, the court did consider whether the prior federal stamp tax was applicable to leasehold interests.  However, the court ultimately rejected the federal rule used to determine what type of leasehold interests qualified for a transfer tax.  Instead, the court looked to state property tax law to make that determination, holding that "the Legislature intended [the term "realty sold" in section 11911] to be defined consistently with the phrase 'change of ownership' in section 61," which required a lease term of 35 years or more.  *Santa Clara County* and *Thrifty* illustrate that although the prior federal interpretations of the long expired stamp tax may prove helpful in assessing the meaning of the DTTA, federal law does not dictate the meaning of the DTTA.

There are multiple reasons why federal interpretations of former 26 U.S.C. section 4361 are of limited utility in assessing the specific issue in this case, which involves the transfer of a partnership that owned a single-entity limited liability corporation that held title to an apartment building.  First, the former federal tax stamp scheme applied to multiple categories of transfers: transfers of interests in capital stock (which extended to interests in capital profits, property and accumulations) were taxed under one provision (former section 4321), while conveyances of realty were separately taxed under a separate provision (former section 4361).  It is therefore understandable that the conveyance tax set forth in former section 4361 would not apply to the type of transaction at issue here because, as Ardmore explains in its brief, application of the federal tax under such circumstances would presumably result in double taxation: one set

27

of stamp taxes for the transfer of interests in the legal entities themselves and a second stamp tax for the realty held by the lower-tier entity. California, however, has not adopted a separate documentary tax on instruments or writings transferring interests in the profits or accumulations of legal entities. Thus, under the state DTTA, applying the transfer tax to the transaction here would result in only one transfer tax.

The former federal stamp tax is also of limited utility in addressing the specific transaction before us because limited liability companies did not exist in California until 1994, which is almost 30 years after the federal stamp tax expired. (*City of Los Angeles v. Furman Selz Capital Management, L.L.C.* (2004) 121 Cal.App.4th 505, 513 [describing history of LLCs in California].) ""A limited liability company is a hybrid business entity that combines aspects of both a partnership and a corporation. . . . It is formed under the Corporations Code and . . . provides members with limited liability to the same extent enjoyed by corporate shareholders, yet allows members to actively participate in management and control." (*Ibid.*) Depending on the elections made by the LLC and the number of its members, the company may be treated for state and federal income tax purposes as either a corporation, partnership or as a disregarded entity. (See *id.* at pp. 513-514; 26 C.F.R. § 301.7701-3.) Given that single-entity LLC's such as Ardmore (whose sole purpose is to hold realty) did not exist when the federal stamp tax was in effect, we find prior interpretations of the federal stamp tax to be of limited use here.

Finally, as discussed at length above, since the DTTA was adopted in 1967, there have been changes in California law suggesting the Legislature endorses the view that section 11911 permits counties and cities to impose a documentary tax on transfers of interests in legal entities that result in a "change of ownership" within the meaning of section 64. Most notably, the Legislature has required the assessor to provide county and city recorders information regarding changes in ownership of legal entities for the express purpose of determining the applicability of the transfer tax. We should not ignore these changes in the law merely because section 11911 was initially patterned on a federal statute that was never tested against facts similar to those presented here.

28

Ardmore next contends that we should interpret section 11925 as setting forth the sole legal authority for a transfer tax based on transfers of interests in a legal entity. In sum, section 11925 provides that the tax may not be applied to transfers of interests in partnerships or entities treated as partnerships for federal income tax purposes (collectively partnership entities) that hold realty unless the transfer results in the termination of the partnership entity within the meaning of 26 U.S.C. section 708. Section 708, in turn, provides that a partnership is treated as terminated if more than 50% of "the total interest in partnership capital and profits" is transferred within a 12-month period.[11] Ardmore argues that because the Legislature has adopted a specific provision explaining that the transfer tax may be applied to transfers of certain types of legal entities (partnerships entities that own realty) under some circumstances (transfers that result in the partnership entity's termination), we should assume it did not intend the tax to apply transfers of interests of any other form of legal entity that might hold realty, such as a single member, disregarded LLC.

Ardmore overlooks the fact that section 11925 is an exemption to the transfer tax authorized under section 11911. Section 11925 effectively provides that a transfer of interests in a partnership holding title to realty does not constitute "realty sold" under section 11911 unless the special conditions set forth in the exemption are satisfied (i.e., termination within the meaning of section 708). The Legislature has not provided an exemption for transfers of interests in any other type of entities that hold realty. We must therefore assume transfers of interests in non-partnership entities that hold title to realty (including single-member, disregarded LLCs) are taxable if the transfer results in the "sale" of realty within the meaning of section 11911. (See *Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 437 ["Under the maxim of statutory construction, *expressio unius est exclusio alterius*, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary.

---

**11** Ardmore has taken the position that section 11925 was inapplicable to BA Realty LLLP, because, although a partnership, LLLP did not "hold realty"; instead, it owned an LLC that held realty.

[Citations.]"].)  As discussed above, we interpret the term "realty sold" within section 11911 to generally apply when a transfer of interest in a legal entity results in a "change of ownership" within the meaning of sections 64 (c) and (d).  Section 11925 merely clarifies that this general rule is inapplicable when a partnership entity holds title to the realty; under such circumstances, a transfer tax is only appropriate if the transfer results in the termination of the partnership entity within the meaning of 26 U.S.C. section 11925.

To summarize, under the DTTA, a documentary tax may be applied to transfers of interests in legal entities pursuant to section 11911 if the transfer results in a "change of ownership" under section 64, subdivision (c) or (d).  However, where title to realty is held by a partnership entity, a transfer of interest in the partnership entity is taxable only if the transfer results in termination within the meaning of section 708, which generally applies when more than 50% of the partnership entity's interests are transferred within a 12-month period.

We do not suggest that Ardmore's interpretation of the DTTA is unreasonable, recognizing that the Act is not a model of clarity.  During the 45 years since it was passed, extensive statutory changes governing the formation of legal entities and property taxation have arguably made the task of interpretation even more difficult.  As with any statute, however, our ultimate goal in interpreting the DTTA is to "'ascertain the intent of the Legislature so as to effectuate the purpose of the law.'  [Citation.]" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632.)  "When statutory language permits more than one reasonable interpretation, '"we 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'"' [Citation.]" (*Rea v. Blue Shield of California* (2014) 226 Cal.App.4th 1209, 1225.)  In this case, the history of the DTTA and the overall structure of the Revenue and Taxation Codes indicate the Legislature generally intended the documentary tax to apply when there has been a sale, memorialized in writing, that results in a transfer of realty.

Interpreting the term "realty sold" to include the "change of ownership" provisions applicable to legal entities promotes this purpose by capturing most forms of legal entity transfers that result in a change in the beneficial ownership of the property.

Ardmore's proposed interpretation would, however, work at cross purposes, effectively permitting property owners to avoid the transfer tax by conveying their real property to a wholly owned, single entity LLC established for the sole purpose of holding the property, and then selling the LLC (rather than the property) to a third party. Although Ardmore has thoroughly briefed this case, it has never identified any policy reason that would support imposition of a transfer tax when realty is transferred through a direct sale, but not when realty is transferred through the sale of an LLC established solely to hold the realty. We believe the Legislature has signaled—both through the acts it has taken and the acts it has not—that the transfer tax should be interpreted to apply under both circumstances, and in any other circumstance where a transfer in legal entity interests results in a change of ownership within the meaning section 64, subject to the express limitations set forth in section 11925.

### C. *Application of the DTTA to the Current Transaction*

We conclude the County was permitted to impose a transfer tax under the circumstances presented here. The parties do not dispute that several subtrusts collectively owned BA Realty (a partnership), which was the sole member of Ardmore (a disregarded limited liability company) that held title to an apartment building. The subtrusts then sold an approximate 45% interest in BA Realty to the Bruce Trust (the beneficiary of which was Bruce Averbrook) and sold an approximate separate 45% interest to the Allen Trust (the beneficiary of which was Allen Averbrook).

As Ardmore has argued throughout these proceedings, under these circumstances, the exemption set forth in section 11925 was inapplicable because BA Realty did not hold title to the realty; instead, it owned Ardmore, which held title to the realty.[12] We

---

[12]     In its appellate brief, Ardmore argues that if we conclude the transaction is governed by section 11925 of the DTTA, the transfer tax is inapplicable because the

therefore must determine whether the transaction resulted in a change of ownership of Ardmore's realty under section 64 subdivision (c) or (d).

Section 64 subdivision (c) is inapplicable. Although the subtrusts sold approximately 90% of BA Realty to the Bruce and Allen Trusts, the transfer did not result in any single individual or entity holding more than a 50% interest in the partnership or in Ardmore. After the transaction, the Bruce and Allen Trusts each owned an approximate 45% interest in both entities and the Bypass Trust retained an approximate 10% interest in both entities. (See generally *Ocean Avenue LLC v. County of Los Angeles* (2014) 227 Cal.App.4th 344 [section 64, subdivision (c) applies only if the transfer results in a single individual or entity obtaining more than a 50% interest in the entity].)

However, as Ardmore admits in its appellate brief (and previously admitted in discovery responses), the transaction did qualify as a "change of ownership" of Ardmore's realty under section 64, subdivision (d). The "statement of change in control and ownership of a legal entity" that Ardmore filed with the Board of Equalization indicates that the subtrusts were the "original coowners" of BA Realty within the meaning of section 64, subdivision (d).[13] The subtrusts then collectively sold more than a

subtrusts' sale to the Bruce and Allen Averbrook did not technically result in a "termination" of BA Realty within the meaning of section 708. In sum, Ardmore contends that, under federal income tax law, Gloria was treated as the owner of the Bruce and Allen Trusts because she retained the authority to withdraw any property from those trusts and replace it with other property of equal value. Ardmore further asserts that because Gloria was treated as the federal income tax owner of the subtrusts and both of hers sons trusts, the sale of BA Realty from the subtrusts to her subtrusts was essentially a sale to herself, and therefore not a termination within the meaning of section 708. We need not address this argument because, as explained above, we agree with Ardmore's argument that section 11925 is not applicable to this transaction. It is therefore immaterial whether a termination of the partnership occurred within the meaning of section 708.

[13] The statement of change in ownership indicates the subtrusts became "original coowners" of BA Realty through a series of excluded "proportional interest transfers" (see Cal. Code. Regs., tit. 18, § 462.180, subd. (d)(4)) governed by section 62,

50% interest in BA Realty to the Allen and Bruce Trusts, triggering a change in ownership under subdivision (d). We therefore conclude that the County was permitted to impose a transfer tax and affirm the trial court's judgment.

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.

ZELON, J.

We concur:

PRELUSS, P. J.

WOODS, J.

---

subdivision (a)(2). The family trust (of which Gloria was the beneficiary) initially owned BA Realty, Ardmore and the apartment building. The family trust conveyed the apartment building to Ardmore, and then transferred Ardmore to BA Realty. Both of these transactions fell within section 62, subdivision (a)(2) because Gloria, as the beneficiary of the family trust, remained the beneficial owner of 100% of the apartment building. The family trust later distributed its interest in BA Realty among the subtrusts. This transaction also fell within section 62, subdivision (a) because Gloria was the beneficiary of the family trust and each of the subtrusts. As a result of the latter transaction, the subtrusts were treated as "original coowners" of BA Realty.

33